## Case No. 2,949.

### COFFIN et al. v. The JOHN SHAW.

[1 Cliff. 230.] [1]

Circuit Court, D. New Hampshire. May Term, 1859.

#### BAR TO SALVAGE CLAIM—COMPENSATION.

1. The failure of libellants to refer their claim for salvage, as agreed, was held, under the circumstances of this case, to be no bar to the suit, and could only be taken into the account as evidence to reduce the amount which libellants were entitled to recover.

2. Nothing short of a contract to pay a given sum for the service to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious salvage claim.

[Cited in The Camanche, 8 Wall. (75 U. S.) 478; The Louisa Jane, Case No. 8,532.]

3. Obiter. A proposition by salvors that, in case they were unsuccessful in raising the vessel, they should have the privilege of stripping her, being made in advance of any effort by them to save the vessel, was highly objectionable, and must be regarded as detracting very materially from the merit of their service.

4. That the risk was slight, and the duration of the salvage service comparatively brief, affect the value of the same, and the amount to be allowed, but cannot be a bar to the claim.

[Appeal from the district court of the United States for the district of New Hampshire.]

This was an appeal in admiralty. The libel set forth that the schooner John Shaw, laden with hard-pine timber, and of the burden of about one hundred and sixty tons, was wrecked on the 12th day of August, 1858, and in peril of being entirely lost on the high seas, west of Nantucket, near Nantasket; that the master and crew requested the libellants [George B. Coffin and others] to assist in saving the vessel and her cargo; that, at the risk of their lives, they commenced their efforts to save the vessel, and for forty-eight hours, during

the most of which time a violent gale was blowing, and the sea running high, they continued their exertions, and finally succeeded in bringing the schooner and most of her cargo safely into the harbor of Edgartown, in the district of Massachusetts. It was further alleged, that without the aid of the libellants the schooner and her cargo would not have been saved, as she was in a dangerous position, with no anchors out, and her master and crew were throwing overboard the cargo for the purpose of lightening the vessel. The claimants of the schooner and cargo both filed answers to the libel. These answers were in substance the same. That the schooner was wrecked, or in danger of being lost, or was unmanageable, or that her master requested the assistance of the libellants, were denied in both answers. It was further set up in the answers, that the schooner was not near any reefs or breakers; that the water was of sufficient depth between the shoal on which she was aground and the land to float the vessel; that no signals of distress were set; and that the schooner was not considered by her master in peril of being lost. The answers allege that the libellants assisted in anchoring the schooner and getting her off under a contract, and that the libellants volunteered their services, which were in the first instance declined by the master, but were afterwards received upon condition that their compensation should be estimated by two referees, one to be chosen by the master of the schooner, and the other by the libellants. All the allegations of the libel concerning the violence of the wind and the condition of the sea were also denied, and it was alleged that the crew of the schooner shared in the labor and service performed by the libellants. The loss of twenty-three thousand feet of lumber, with which the schooner was loaded, was set forth; denial of any salvage service by the libellants was made, and the willingness of the respondents to account with the libellants, and pay them such sum as might be due, subject to any claim of respondents for the loss of lumber by the act or default of libellants, was averred in the answers. In the district court a decree was entered for the libellants in the sum of ninety dollars, to be equally divided among them, and for a further sum of twenty dollars to one of said libellants for the loss of his boat, without costs.

Horace Webster, for libellants.

W. H. Y. Hackett, for claimants.

CLIFFORD, Circuit Justice. According to the testimony, the schooner sailed from Savannah, in the state of Georgia, bound on a voyage to Portsmouth, in the state of New Hampshire. She was a vessel of about one hundred and fifty-six tons' burden, with a company of five men, consisting of the master and mate, two foremast hands, a cook,

[1] [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

and steward. They had on board a cargo of hard-pine timber, measuring about one hundred thousand feet. It filled the hold of the vessel, and there was about thirty-five thousand feet on the deck. On the 11th of August, 1858, about ten o'clock at night, the schooner ran on to a sand shoal between Maskeget and Tuckernuck islands, and stuck fast at a point where the water at low tide is about six feet deep. After the vessel struck, she swung round stem off, heading south-southwest. Her master then trimmed her sails accordingly, and she remained in that position until the following morning. In the mean time he began to get off part of her deck load, supposing that he was on a reef at the new south shoal, and thinking that, by lightening the vessel, she might pass over the shoal as the tide rose. He threw over three sticks of hewn timber of about a thousand feet each, cutting one in two pieces because it was so long that he could not otherwise get it over the rail. Two or three smaller sticks were also thrown over during the night; but finding that the vessel lay without thumping, he ordered the crew to stop heaving the timber over till daylight, when he could see what was the position of the vessel. Seven large sticks of hewn timber still remained on board, and in the morning the master renewed the direction to the crew to commence heaving it over. Shortly after this order was given, and while the crew were employed in carrying it into effect, one of the libellants came to the schooner in a boat, and inquired of the master whether he wanted assistance, and the master told him he wanted a pilot. At the time the schooner ran on to the shoal the master says he was steering north by west, as ascertained by the compass. He had determined the longitude, however, by the chronometer, which made him forty miles farther east than he really was, and it does not appear that his mistake was in any manner corrected until he was visited by the libellants. The master inquired of the libellant, when he first went on board, whether he was acquainted with these shoals, and whether he could pilot the vessel out. Both of these questions were answered in the affirmative, and the libellant expressed the opinion that by lightening the vessel she might be got off during that tide. They then went to work heaving over the timber from the deck, and continued to do so until the tide began to slacken. When the tide slackened, they ran out the kedge anchor about one hundred and twenty fathoms, and the master also let the larboard anchor drop. During the time they were so engaged the other seven libellants arrived in a boat from Tuckernuck, and went on board. After some conversation, the libellant first named informd the master that they wanted fifteen hundred dollars in case they should assist in getting off the schooner, which the master declined to give. On hearing that remark of the master, five of the libellants left the schooner, and went and picked up several other sticks of the floating timber. They were absent about three quarters of an hour. Some further conversation ensued, during their absence, between the master and those who remained, which was renewed and continued after their return. As the result of these several conversations, it was arranged between the parties, as the master says, that the libellants should assist in getting off the schooner, and that they would leave the matter to two disinterested men, one to be chosen by each party, to settle the amount of the compensation, and with that understanding they went to work. Three of the libellants were examined upon this point. One of them testifies that the master, when asked the second time if he wanted assistance, answered in the affirmative, and that the arrangement was, if they got her off, and could not agree upon the amount of compensation, that they were to leave it out, and in case they failed, they were to have the privilege of stripping the vessel. Another says that the master, after the five men returned, desired them to proceed and get the vessel off, remarking, at the same time, that if they could not agree upon the price, they would leave it out. George B. Coffin testifies that the master requested them to take the vessel and proceed, and that they thought he could get her off, and that one of the libellants remarked that if they did not succeed they were to have the privilege of stripping her, and on these terms they proceeded in the undertaking. One of the seamen on board the schooner was also examined on this point by the respondents. He testifies that the master declined the offer first made by the libellants; but he admits that he afterwards heard him assent that they might go to work while he and one of their number went aft to converse about the terms. All the testimony shows that the master accepted the services of the libellants, and that no definite sum was agreed on as the measure of compensation for the service to be performed. They finally went to work under the arrangement, and on the terms that if successful, and they could not agree as to the price, the matter should be submitted to referees, to be chosen as stated in the testimony of the master. It seems that so much of the suggestion of the libellants as contemplated the stripping of the vessel, in case they were unsuccessful, was not acceded to by the master. That proposition, made as it was in advance of any efforts on the part of the libellants to save property, was highly objectionable, and must be regarded as detracting very materially from the merit of the service. That the schooner was in some peril cannot successfully be denied. Many other vessels have been stranded on this shoal, and few had ever found effectual relief. She was fast in her position, and the efforts of her officers and crew were insufficient to work her free. The master had lost his course; and being without any knowl-

edge that his chronometer was imperfect or out of order, it is not probable that he would have discovered his mistake without other means than those he had at hand. Part of the cargo had already been thrown overboard, and the crew had become exhausted with continued labor, and stood in need of relief. Under such circumstances it is impossible to say that the vessel was in no peril. It is no sufficient answer to this state of facts to say, even if it were true, as is supposed by the respondents, that the risk and duration of the service were less than they would have been had the elements been more threatening and unpropitious. That argument is a proper and forcible one as affecting the value of the service, and the amount to be allowed, but it is wholly insufficient under the circumstances of this case as a bar to the claim for salvage. Forty-eight hours or more were spent in performing the service, and during some portion of the time there was a strong tide and considerable wind. As before remarked, some portion of her deck load had been thrown overboard before the libellants arrived, and after they took charge of the schooner they found it impossible to work her off by heaving at the windlass until her deck had been nearly or quite cleared. Two boats were used in carrying out the anchors, and one or more of the witnesses testified that the anchor and chain loaded them so deep that one or two men had to bail water nearly all the time they were carrying them out to prevent the boats from sinking. All the circumstances show, not only that the vessel and cargo stood in need of relief, but that the assistance as finally rendered, at the request, or at least by the assent, of the master, was not unattended with some danger and personal risk. In the first instance, it is true that the master only requested a pilot, and declined the proffered aid, hoping, doubtless, to get his vessel off by the efforts of his own crew; but the case clearly shows that he subsequently changed his mind, and set the libellants at work. They demanded unrestricted salvage compensation, which the master refused to allow. Efforts were then made to agree upon a definite sum; but the parties could not, and did not, agree. Finding they could not agree upon a fixed compensation, it was arranged that the libellants should render the service, and, in case they disagreed, the matter was to be submitted to referees. That stipulation was never carried into effect, and each party charges the other with fault in that particular. Propositions to that effect were made on both sides, and as often as they were made they were rejected by the opposite party. As compared with the arrangement between them before the service was rendered, no one of the propositions appears to be entirely free from objection. One or more of those made by the libellants were unreasonable, and their conduct in that behalf cannot be altogether overlooked in fixing upon the amount of the compensation they

are entitled to receive. Their failure to refer, under the circumstances of this case, is no bar to the suit, and can only be taken into the account as evidence to reduce the amount they are entitled to recover. Nothing short of a contract to pay a given sum for the service to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious salvage claim. Hennessey v. The Versailles [Case No. 6,365]; The William Lushington, 7 Notes Cas. 361; The Centurion [Case No. 2,554]; The H. B. Foster [Id. 6,290]; The Independence [Id. 7,014]. Some of the timber was lost, but it is not perceived that there is any sufficient evidence in the case to show that it was by the neglect or through the default of the libellants. Salvors are allowed a liberal compensation for their services for two reasons: first, as an inducement to engage in the service; and, secondly, to withdraw from them every motive of unfaithfulness in the performance of their duties. Fraud or gross negligence is visited by the law with an entire forfeiture of claim to compensation. But the burden of proof, when any such imputation is made, lies on the party making it, and when not proved, of course the charge cannot be sustained. In view of all the circumstances, I think the libellants are entitled to a salvage compensation, but less than is usually allowed in cases of this description. Five hundred dollars I think a reasonable compensation. Accordingly, the decree of the district court is reversed, and let a decree be entered in favor of the libellants for that amount, with costs in both courts.