Peelle, Ch. J.,
delivered the opinion of the court:
This is a claim for salvage by the steam tug Dorothy in checking a metal caisson, belonging to the United States, from drifting out to sea.
The caisson, 32 feet in diameter, drawing 16 feet of water, and projecting 14 feet above water, ballasted with concrete, was lashed to the port bow of the United States light-house tender Arbutus for carriage to the site of the Sabine Bar light-house, some 16 miles distant. On June 11, 1904, at about 7.45 p. m., after the Dorothy, then under contract with, the Government, had moored in the harbor for the night, and during a hurricane, the caisson broke away from the Arbutus *309 and floated down the Sabine Pass toward the sea, and was in danger of drifting on the stone jetties lining the pass a short distance beyond the light-house station.
The Dorothy, after procuring a hawser belonging to the Light-House Department, overtook the caisson and succeeded in towing it on a mud bank and held it there until the arrival in a yawl of Captain Peterson and six men of the crew of the Eugenia, and they, together with the crew of the Dorothy. made a line fast to a cluster of piling and thereby held the caisson until the arrival a few minutes later of the Arbutus with the superintendent of the light-house státion for that district on board, who thereafter took charge, directing the work. The Arbutus and the Dorothy together towed the caisson back and tied it fast at the Southern Pacific dock, about 1 o’clock a. m., of June 12, 1904.
The Dorothy was at the time under contract with the Government, through the Light-House Establishment, for use in connection with the construction of the Sabine Bank light station off Sabine Pass, for which she, with her master, single crew, fuel, and equipment, complete, was paid $1,500 per month.
The contract, among other things, provided that—
“ The Light-House Establishment shall not be responsible for any damage by accident or otherwise to said tug while under charter, nor shall payment be made for her services during any time lost because of any damage or disablement sufficient to cause her to be laid up for repairs.
“ The crew and master of the boat being employed by the owner, the Light-House Establishment will be held for no damage arising from accident or otherwise while this agreement is in force.”
The claimants’ contention is that their timely interposition was the proximate cause of extricating the caisson from its perilous position and that, therefore, notwithstanding their contract with the Government, as aforesaid, they are entitled to recover their expenses and a reasonable compensation for the time employed, together with a reward given as a matter of public policy to persons for rendering such service; or, if not entitled to recover on the basis of salvage, that they be allowed to recover on an implied contract for the reasonable value of the service performed — i. e., in quantum meruit.
*310 The defendants’ contention is that, even if the caisson was the subject of salvage, the clauses of the contract set out above exempt the Government from any liability for damage by accident or otherwise to the Dorothy while under charter; and, further, that the caisson rescued was not the subject of a salvage claim, not having been constructed for purposes of navigation and not being the cargo of any vessel.
Assuming that but for the timely interposition of the Dorothy the caisson would have drifted on the stone jetties, and thereby at least have been injured, or would have drifted out to sea and been lost, was the property so rescued such as to charge the Government with a salvage claim?
In the case of Cope v. Valletta Dry Dock Co. (119 U. S., 625), the court, in speaking of a floating dry dock permanently moored which was rescued from sinking by the master and crew of a tugboat, which the circuit court had held was not salvage service, said:
“ We have no hesitation in saying that the decree of the circuit court was right. A fixed structure, such as this dry dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a. wharf or a warehouse when projecting into or upon the water. The fact that it floats on the water does not make it a ship or vessel, and no-structure that is not a ship or vessel is a subject of salvage. A ferry bridge is generally a floating structure, hinged or chained to a wharf. This might be the subject of salvage as well as a dry dock. A sailor’s floating bethel, or meetinghouse, moored to a wharf, and kept in place by a paling of surrounding piles, is in the' same category. It can hardly be contended that such a structure is susceptible of salvage service. A ship or vessel, used for navigation and commerce, though lying at a wharf, and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects, and are capable of receiving salvage service. ‘ Salvage is a reward or recompense given to those.by means of whose labor, intrepidity, or perseverance a ship or goods have been saved from shipwreck, fire, or capture.’ (2 Bell’s Com. Laws of Scotland, § 638, Yth ed.; ib., Principles of Laws of Scotland, 7th ed., § 443.) ‘ Salvage ’ says Kent, ‘ is the compensation allowed to persons by whose assistance a ship or its cargo has been saved in whole or in part from impending danger, or recovered from actual loss, in cases of shipwreck, derelict, or recapture.’ (3 Kent, 245.) * * *
*311 “ If we search through all the books, from the Rules of Oleron to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, or those things which have been committed to or lost in the sea or its branches, or other public navigable waters, and have been found and rescued.”
Then, in defining the terms “ ships ” and “ vessels,” the court, quoting from the case of The Mac (7 P. D., 126, 130), wherein the court respecting the use of a hopper barge, used in carrying men and mud, had said:
“ Perhaps this case goes as far as any case has gone in extending the meaning of the term ‘ ship ’ or ‘ vessel.’ Still, the hopper barge was a navigable structure used for the purpose of transportation. We think no case can be found which would construe the terms to include a dry dock, a floating bridge, or meetinghouse, permanently moored or attached to a wharf.”
It has also been held that a lighted gas buoy, though used as a signal of danger and to direct the course of vessels, was not a subject of maritime salvage, because it was unfit for the purpose of being navigated as a vessel and was never so used or intended. (Wells v. Gas Float, Whitton No. 2, 1897, A. C., 343, 348.)
And so it has been held that a steamboat which had been dismantled, stripped of her boiler, engine, and paddle wheels, and fitted up as a saloon and hotel while being towed from one place to another for the same purpose, was not a subject of salvage, because it was not engaged in commerce and navigation (The Hendrick Hudson, 3 Ben., 419).
Other cases might be cited to the same effect, but we do not understand that the claimants are seeking recovery for salvage on the theory that the caisson was rescued as a ship or vessel used or intended for use in commerce or navigation. But they rely upon the last case cited to support their theory that the caisson was cargo, because under the control of a navigable vessel — that is, that the caisson should be considered in pari materia as cargo — and as such subject to salvage.
In the case of the Fannie Brown (30 Fed. R., 215-220) the court in defining salvage said:
“ Salvage is a reward decreed by a court of admiralty for services successfully rendered in saving property from mari *312 time danger by persons under no obligation of duty to render the services and who voluntarily enter upon them. * * * Danger, peril, and a, successful deliverance from it by voluntary effort — that is what constitutes a case of salvage; and the court apportions the reward with reference to the degree of peril, the success of the service, and- the circumstances of each particular case.”
In the case of the Clarita and the Clara (23 Wallace, 1, 16) the court said:
“ Salvage is well defined as the compensation allowed to persons by whose assistance a ship or vessel, or the cargo of the same, or the lives of the persons belonging to the ship or vessel, are saved from danger or loss in cases of shipwreck, derelict, capture, or other marine misadventures.
“ Other jurists define it as the service which volunteer adventurers spontaneously render to the owners, in the recovery of property from loss or damage at sea under the responsibility- of making restitution, and with a lien for their reward.” (Maud and Pollock on Shipping, 419; Machlach-lan on Shipping, 569; The Neptune, 1 Haggard’s Admiralty, 236; The Thetis, 3 Id., 48.)
In the case'of Cope v. Valette Dry Dock Co. (supra) respecting goods lost at sea and found floating on the surface, the court said:
“ There has been some conflict of decision with respect to claims for salvage services in rescuing goods lost at sea and found floating on the surface or cast upon the shore. When they have belonged to a ship or vessel as part of its furniture or cargo they clearly come under the head of wreck, flotsam, jetsam, ligan, or derelict, and salvage may be claimed upon them. But when they have no, connection with a ship or vessel some authorities are against the claim, and others are in favor of it. Decisions in favor of the claim in reference to rafts of timber found floating at sea were made by Judge Betts in the New York district, A Raft of Spars, 1 Abbott’s Adm., 485, and by Judge Lowell in the Massachusetts district, 50,000 Feet of Timber, 2 Lowell, 64, and against it by Chief Justice Taney, in the United State circuit court for the district of Maryland, Tome v. 4 Cribs of Lumber, Taney’s Dec., 533, and by the English court of exchequer, in Palmer v. Rouse, 3 H. & N., 505.”
In Carver’s Carriage by Sea, third edition, sections 335 and 337, the same principle is announced. That is to say, services voluntarily rendered by persons strangers to the *313 vessel in distress or to the property floating on the sea are only rewarded by the court when the property is or has been a ship or her cargo or some floating structure capable of and designed for navigation.
The writer of that same text-book says, section 321:
“ But, whether in a river or at sea, the property saved must be a ship, or her apparel, or cargo, or the wreck of them. The right does not arise on saving property of other kinds which may have been moored afloat and have got adrift, such as a raft of timber, a buoy, or a floating dry dock.”
The author cites in that paragraph the Gas Float Whitton No. 2 (supra) ; Nicholson v. Chapman (2 H. Bl., 254) ; Palmer v. Rouse (27 L. J., Ex., 437) ; Raft of Timber (2 W. Rob., 251) ; Cope v. Vallette Dry Dock Co. (supra).
Rescuing the boilers of a vessel by pulling them out of a river has been held salvage service. The Silver Spray boilers, 1 Brown Adm., 349. •
The caisson was in no way used or intended for use in navigation! It was not the apparel of the Arbutus or her cargo, in the ordinary meaning of cargo, nor was it the wreck of either, but as it was lashed to the bow of the Arbutus, for the purpose of transportation, from which the caisson broke away, we think it may fairly be considered akin to, if not in the category of, cargo, and therefore the subject of a salvage claim.
The caisson had not broken away from permanent moorings, but was being transported by the ArbuPus by the way of towage from one place to another. It was more convenient to tow than it was to load it on the vessel, even if the latter could have been done. Therefore we think it is clearly distinguishable from those cases referred to which exclude floating dry docks permanently moored, as a sailors’ floating bethel, or meeting house, moored to a wharf, a lighted gas buoy, etc., and we must therefore hold that the caisson was the cargo of the vessel to which it was lashed.
Where the property is saved by the masters and crews of different vessels, those materially contributing thereto are entitled to share in proportion to the risk and value of the services rendered. Nor will the failure of one set of salvors *314 to prosecute their claim, for any cause, inure to the benefit of those who do. (Norris v. The Island City, 1 Cliff., 219; The Blackwall, 10 Wall., 1; The Island City, 1 Black, 121; Coffin, v. The John Shaw, 1 Cliff., 230.)
' The owners of the salving vessel may share in the salvage awarded though not present at the time the property was rescued. The Ottawa (1 Low., 274), The Charles Henry (1 Ben., 8).
But if the salvage awarded to the owners of the salving" vessel include the services of the master and crew as well, as it does in this case, because the owners of the tug have the general charge of the claim for salvage, such owners upon receipt of the salvage will be held accountable to them for their share of the same. (Roff v. Wass, 2 Sawy., 538.)
In the present case, but for the timety assistance of the Arbutus, the Dorothy would doubtless have been unable to tow the caisson back into the harbor. However, it must be conceded that but for the immediate interposition of the Dorothy the caisson would have drifted on the stone jetties or out to sea, but whether said drifting would have resulted in damage or loss is necessarily problematical. While it must' appear that the property was shbject to something more than the ordinary perils of the sea, it is not necessary that the loss should be inevitably certain, but it must appear that the property was exposed to damage or destruction. (The Saragossa, 1 Ben., 551.) Nor will the fact that the peril was slight and the duration of the service brief prevent the recovery of salvage if the claimants are otherwise entitled thereto. (Coffin v. The John Shaw, 1. Cliff., 230.)
There can be no doubt but that the services rendered by the Dorothy contributed immediately to the rescue of the caisson in peril, and to that extent a benefit resulted to the defendants for which the claimants, in the absence of any contract to the contrary, are entitled to recover salvage. (Clark et al. v. Brig Dodge Healy and Cargo, 4 Wash. C. C., 651; The Sailor’s Bride, 1 Brown Adm., 68; Jackson v. The Magnolia, 20 How., 296; The Williams, 1 Brown Adm., 216.)
*315 But if for want of benefit accruing to the property the claimants had no right as salvors and, therefore, no remedy ■in rem, still, having acted in good faith with the vessel believed to be adequate to rescue the property in peril, they would be entitled.to recover in quantum meruit even though their efforts had been unsuccessful. The Sailor’s Bride, supra, The Williams, supra, Allen v. Newberry, 21 How., 244, and other authorities hereinbefore cited. Salvage, however, is a reward upon the basis of the risk to life and property to be awarded with that discreet liberality which will encourage others to like undertakings. Taylor v. The Cato (1-Pet. Adm., 48, 65) ; The John E. Clayton (4 Blatchf., 372) ; The Emulous (8 Cranch., 110) ; The M. B. Stetson (1 Low., 122). Upon the latter 'basis the claimants are entitled to recover in this case unless they are precluded therefrom by reason of their contractual relations with the Government. •
Let us now look at the contract between the parties and see if anything therein prevents the claimants from being held strangers to the property saved. The Dorothy, with her master, crew, fuel, and equipment complete, with a single crew, was chartered to.the Government through the LightHouse Establishment “ for use in connection with the construction of the Sabine Bank Light Station, off Sabine Pass, Gulf of Mexico,” at a monthly rental of $1,500 per month so long as might be needed. By the terms of the contract the Government was not to be responsible for any damage by accident or otherwise to said tug while under charter. The boat was chartered with a “ single crew to be furnished ” and paid by the claimants; and as the vessel and crew were to remain under the control of the claimants they alone were responsible for whatever damage might result to the vessel from accident or otherwise while under charter.
After the charter the Dorothy was assigned to the duty of towing the Government barge Eugenia from the Sabine Harbor to the proposed site of the Sabine light station and back to the harbor from day to clay, so that the Government officers construed the charter as a contract for day service, or for such service as contemplated by a single crew; and the claimants having performed the clay’s work assigned -to them, arid *316 moored the tug for the night, can it be said that they would have violated their contract had they neglected to steam in pursuit of the drifting caisson? We think not. The officers of the Government could not have required them to perform exceptional services under their contract, thereby compelling them to assume exceptional responsibility for injuries to their vessel, as such exceptional service was not within the terms or scope of their contract, and therefore not contemplated by the parties when the contract was entered into.
The damages for which the claimants agreed to be responsible were such as might result to their vessel from accidents or otherwise in the performance of the duties assigned them by the Government officer, and it can not therefore be held that their contract deprived them of the status of strangers to the property saved.
Even if the claimants had been under contract — other than extraordinary — to tow the caisson, exceptional services, requiring extraordinary aid from the vessel, might have given them the right to abandon such contract and claim salvage. That is to say, if after the towage service began the caisson had been placed in exceptional danger, such as sudden violence of wind or waves or other unforeseen accidents not Avithin the scope or contemplation of the parties when the agreement was entered into, they would be entitled to additional remuneration for the additional service rendered if the property be saved, or they might claim as salvors instead of being restricted to the contract price for the mere towage. (Collius v. The Fort Wayne, 1 Bond., 476 and 481; Carver’s Carriage by Sea, sec. 339, and authorities there cited.)
Had the caisson been rescued at a time when the Dorothy was under charter to perform other service for the Government, i. <?., during the time when she was subject to the order of Government officers, that Avould not have deprived the claimants from claiming salvage for the exceptional service unless, by the terms of the charter, the salved property was in the possession of the owners of the salving vessel (Carver's Carriage by Sea, sec. 343). “ On the other hand,” as stated in that section, “ the fact that the owner of the salving vessel has at the time chartered her to the owner of that which is *317 salved, does not disentitle him from claiming salvage ” (The Maria, Jane, 14 Jur., 857; The Waterloo, 2 Dod., 433, and other authorities therein cited; Roff v. Wass, 2 Sawy., 389.)
It must therefore be held that at the time the service was rendered by the claimants they were strangers to the property saved, and such service having contributed immediately to the rescue of the vessel from the extraordinary peril caused by the sudden violence of the wind and waves, they are entitled to recover reasonable salvage therefor; but the fact that they.were assisted by those who were not strangers to the property saved can not be held to accrue to the benefit of the claimants even though such strangers make no claim to salvage, and therefore the claimants are only entitled to recover the reasonable pro rata share for the sacrifice which they with the master and crew of the vessel made, which the court finds is 20 per cent of the value of the property saved, or $2,800. (Tyson v. Prior, 1 Gall., 133; Roff v. Wass, supra.)
No allowance can be made to the claimants for injuries to their vessel, as the loss sustained by them'in rescuing the property was one of the risks they ran and for which they seek indemnification for the sacrifices they madé. But while this is true, such injuries, together with the time during which the vessel was undergoing repair, the risk taken, and the value of the property saved may all properly be considered in determining the amount of salvage, and to that end such elements have been taken into consideration by the court in this case. (Carver's Carriage by Sea, secs. 344, 345.)
Judgment is therefore ordered in the claimants’ favor for $2,800, being the reasonable pro rata share of salvage for the Dorothy, her owners, masters, and crew, as hereinbefore set forth, upon the receipt of which the claimants herein are to be accountable to the master and crew of the Dorothy for their respective interests to be hereafter determined.