## COPE *v.* VALLETTE DRY DOCK COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF LOUISIANA.

Argued December 6, 1886. — Decided January 10, 1887.

A fixed structure, contrived for the purpose of taking ships out of the water in order to repair them, and for no other purpose, consisting of a large oblong box, with a flat bottom and perpendicular sides, with no means of propulsion either by wind, steam, or otherwise, and not designed for navigation, but only as. a floating dry-dock, permanently moored, is not a subject of salvage service.

This was an appeal from a decree of the Circuit Court dismissing a libel for salvage for want of jurisdiction. The case is stated in the opinion of the court.

*Mr. J. R. Beckwith*, for appellant, cited: *Ghen* v. *Rich*, 8 Fed. Rep. 159; *Taber* v. *Jenny*, 1 Sprague, 315; *Bartlett* v. *Budd*, 1 Lowell, 223; *Swift* v. *Gifford*, 2 Lowell, 110; *Fifty Thousand Feet of Timber*, 2 Lowell, 64; *Twenty-three Bales of Cotton*, 9 Ben. 48; 2 Twiss' Black Book of Adm. 471; 3 Ib. 439.

*Mr. Alfred Goldthwaite*, for appellees, cited: *The Hendrick Hudson*, 3 Ben. 419; Opinion of Mr. Justice Woods in this case below, 4 Woods, 265, and cases they cited; *Salvor Wrecking Co.* v. *Sectional Dock Co.*, 3 Cent. Law J. 640.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is a libel for salvage filed in the District Court for the Eastern District of Louisiana by the owners of the steam-tug Col. L. Aspinwall, her master and crew, and the owner of the steam-tug Joseph Cooper, and her crew, against the Vallette Dry Dock Company of New Orleans, to recover salvage for salving the company's dry-dock at Algiers, opposite New Orleans, from sinking and becoming a total loss. According

to the allegations of the libel, the said dry-dock was run into by the steamship Clintonia, which did not obey her helm, and by the force of the collision a large hole was broken into the side of the dock, extending below the water-line, and it began to fill with water, and commenced sinking, and would have sunk but for the exertions of the libellants, who hastened to its relief and applied their suction pumps in pumping out the water with which it was being filled, and thus at large expense and much trouble saved her from destruction. The libel alleges that the Vallette dry-dock is a large floating vessel and water-craft and artificial contrivance, used and capable of being used as a means of transportation in water, and was of great value, having cost upwards of $200,000, and was largely and profitably engaged in the business of docking vessels for repairs in the Mississippi River, and the libellants claim that their services were of the greatest merit, deserving a reward of at least $5000.

The respondents pleaded, first, *res judicata*, alleging that a similar libel for the same cause had been formerly filed in the same court and dismissed for want of jurisdiction. This plea was overruled. Their second plea was to the effect that the case is not one of admiralty and maritime jurisdiction; that the assistance rendered by the libellants to the dry-dock was not a salvage service; that the dry-dock is not devoted to the purpose of transportation and commerce, nor intended for navigation; that it is nothing more than pieces of lumber fastened together and placed upon the water to receive vessels for repair, and having engines used, not for the purpose of locomotion from one place to another, (of which, by its own resources, it is incapable,) but solely to lower and elevate said dock, in order to receive vessels for repair; that it was always solely employed in the business of docking and repairing vessels; that at the time of the alleged salvage services it was moored and lying at its usual place where it had been located ever since the year 1866. Proofs being taken, the District Court dismissed the libel upon the plea to the jurisdiction; and on appeal to the Circuit Court, the same decree was made.

The facts found by the Circuit Court substantially corrobo- rate the plea. They describe the dry-dock as a structure contrived for the purpose of taking ships out of the water, in order to repair them, and for no other purpose. They state that it consisted of a large oblong box, with a flat bottom and perpendicular sides; that in the year 1866 it had been put in position by being permanently moored by means of large chains to the right, or Algiers, bank of the Mississippi River, and was sparred off from the bank by means of spars, to keep it afloat. When it was desired to dock a steamboat or other vessel, it was sunk by letting in water until the vessel to be docked could be floated into it. It was then raised by pumping the water out, leaving the docked vessel in a position to be inspected and repaired. It was furnished with engines, but they could only be used for pumping, and the dry-dock had no means of propulsion, either by wind, steam, or otherwise. It was not designed for navigation, and could not be practically used therefor. The circumstances of the collision and rescue were substantially as stated in the libel. As a conclusion of law, the Circuit Court found that the services of the libellants were not salvage services, and that neither that court nor the District Court had jurisdiction of the case.

We have no hesitation in saying that the decree of the Circuit Court was right. A fixed structure, such as this dry-dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a wharf or a warehouse when projecting into or upon the water. The fact that it floats on the water does not make it a ship or vessel, and no structure that is not a ship or vessel is a subject of salvage. A ferry bridge is generally a floating structure, hinged or chained to a wharf. This might be the subject of salvage as well as a dry-dock. A sailor's floating bethel, or meeting-house, moored to a wharf, and kept in place by a paling of surrounding piles, is in the same category. It can hardly be contended that such a structure is susceptible of salvage service. A ship or vessel, used for navigation and commerce, though lying at a wharf, and temporarily made fast thereto, as well as her furniture and cargo, are maritime subjects, and

are capable of receiving salvage service. "Salvage is a reward or recompense given to those by means of whose labor, intrepidity, or perseverance a ship or goods have been saved from shipwreck, fire, or capture." 2 Bell's Com. Laws of Scotland, § 638, 7th Ed.; Ib., Principles of Laws of Scotland, 7th Ed. § 443. "Salvage," says Kent, "is the compensation allowed to persons by whose assistance a ship or its cargo has been saved in whole or in part from impending danger, or recovered from actual loss, in cases of shipwreck, derelict, or recapture." 3 Kent, 245. Lord Tenderden defines it as "the compensation that is to be made to other persons by whose assistance a ship or its lading may be saved from impending peril, or recovered after actual loss." Abbott on Shipping, 554. Sir Christopher Robinson defines salvage as follows: "Salvage, in its simple character, is the service which those who recover property from loss or danger at sea render to the owners, with the responsibility of making restitution, and with a lien for their reward." *The Thetis*, 3 Hagg. Adm. 14, 48. This definition is adopted by Machlachlan, in his Treatise on Merchant Shipping, Chap. XIII. 523. [2d Ed., page 569.] Sir John Nichol, in *The Clifton*, 3 Hagg. Adm. 117, 120, says: "Now, salvage is not always a mere compensation for work and labor; various circumstances upon public considerations, the interests of commerce, the benefit and security of navigation, the lives of the seamen, render it proper to estimate a salvage reward upon a more enlarged and liberal scale. The ingredients of a salvage service are, first, enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress, risking their own lives to save their fellow-creatures, and to rescue the property of their fellow-subjects; secondly, the degree of danger and distress from which the property is rescued — whether it were in imminent peril, and almost certain to be lost if not at the time rescued and preserved; thirdly, the degree of labor and skill which the salvors incur and display, and the time occupied. Lastly, the value. Where all these circumstances concur, a large and liberal reward ought to be given; but where none, or scarcely any take place, the compensation can hardly be denominated a

salvage compensation; it is little more than a remuneration *pro opere et labore.*"

If we search through all the books, from the Rules of Oleron to the present time, we shall find that salvage is only spoken of in relation to ships and vessels and their cargoes, or those things which have been committed to, or lost in, the sea, or its branches, or other public navigable waters, and have been found and rescued.

It is true that the terms "ships" and "vessels" are used in a very broad sense, to include all navigable structures intended for transportation. In a recent case decided by the Court of Appeal, in England, which arose upon that part of the Merchant Shipping Act, 17 and 18 Vict. c. 104, § 458, giving jurisdiction to justices of the peace in certain cases of salvage, "Whenever any ship or boat is stranded, or otherwise in distress, on the shore of any sea or tidal water situate within the limits of the United Kingdom" it was held (overruling Sir Robert Phillimore) that the word "ship" would include a hopper-barge used for receiving mud from a dredging-machine and carrying it out to deep water, though it had no means of locomotion of its own, but was towed by other vessels; it had a bow, stern and rudder, and was steerable. Lord Justice Brett said: "The words 'ship' and 'boat' are used; but it seems plain to me that the word 'ship' is not used in the technical sense as denoting a vessel of a particular rig. In popular language, ships are of different kinds; barques, brigs, schooners, sloops, cutters. The word includes anything floating in or upon the water, built in a particular form, and used for a particular purpose. In this case the vessel, if she may be so called, was built for a particular purpose; she was built as a hopper-barge; she has no motive power, no means of progression within herself. Towing alone will not conduct her; she must have a rudder; and, therefore, she must have men on board to steer her. Barges are vessels in a certain sense; and, as the word 'ship' is not used in a strictly nautical meaning, but is used in a popular meaning, I think that this hopper-barge is a 'ship.' . . . This hopper-barge is used for carrying men and mud; she is used in navigation; for to dredge up and carry away mud and gravel is an act

done for the purposes of navigation. Suppose that a saloon-barge, capable of carrying 200 persons, is towed down the river Mersey in order to put passengers on board of vessels lying at its mouth; she would be used for the purposes of navigation, and I think it equally true that the hopper-barge was used in navigation." *The Mac*, 7 P. D. 126, 130; overruling *S. C.* Ib. 38.

Perhaps this case goes as far as any case has gone in extending the meaning of the terms "ship" or "vessel." Still, the hopper-barge was a navigable structure used for the purpose of transportation. We think no case can be found which would construe the terms to include a dry-dock, a floating-bridge, or meeting-house, permanently moored or attached to a wharf.

There has been some conflict of decision with respect to claims for salvage services in rescuing goods lost at sea and found floating on the surface or cast upon the shore. When they have belonged to a ship or vessel as part of its furniture or cargo they clearly come under the head of wreck, flotsam, jetsam, ligan, or derelict, and salvage may be claimed upon them. But when they have no connection with a ship or vessel some authorities are against the claim, and others are in favor of it. Decisions in favor of the claim in reference to rafts of timber found floating at sea were made by Judge Betts in the New York District, *A Raft of Spars*, 1 Abbott's Adm. 485, and by Judge Lowell in the Massachusetts District, 50,000 *Feet of Timber*, 2 Lowell, 64, and against it by Chief Justice Taney in the United States Circuit Court for the District of Maryland, *Tome* v. 4 *Cribs of Lumber*, Taney's Dec. 533, and by the English Court of Exchequer, in *Palmer* v. *Rouse*, 3 H. & N. 505. Perhaps the decisions in the last two cases were affected by local custom or statutory provisions. None of these cases, however, throw any light on the subject in hand. The case of *Salvor Wrecking Co.* v. *Sectional Dock Company*, reported in 3 Central Law Journal, 640, and the note appended thereto, may be referred to for an interesting discussion of the question. Judge Dillon, in that case, held that a dry-dock is not a subject of salvage service.

*The judgment of the Circuit Court is affirmed.*