THE POMONA.

LOUISIANA & T. R. & S. S. Co. *v.* THE POMONA AND HER CARGO.

(*District Court, D. South Carolina.* January 29, 1889.)

SALVAGE—COMPENSATION—AMOUNT.

   The three-masted propeller Pomona, bound from Port Maria, Jamaica, to New York, broke the tail-end of her shaft, her propeller became useless, and soon after was lost. Her steering apparatus was seriously strained, she became unmanageable, refused to obey her rudder, and made no way. She was out of the regular track of steam-vessels, and could get no substantial assistance for 17 days, during which time she had out signals of distress. The City of New York, valued at $225,000, with a full cargo, bound from New York to Galveston, having been carried out of her course, sighted the Pomona, and at once came to her aid, towed her some 240 miles to Charleston, and hired a tug to take her over the bar. The trip was neither difficult nor dangerous, but was only just in time to avoid very bad weather. The Pomona and her cargo were worth $14,330. The court awards $2,000, including the sum paid to the tug.

   In Admiralty. Libel by the Louisiana & Texas Railroad & Steam-Ship Company against the steam-ship Pomona and her cargo, for salvage.
   *Barker, Gilliland & Fitz Simons,* for libelant.
   *T. M. Mordecai* and *Wing, Shoudy & Putnam,* for respondent.

   SIMONTON, J. This is a case of salvage. There is always much embarrassment in determining the amount of a salvage award. The general principles are well established. Mr. Justice BRADLEY, in *The Suliote,* 5 Fed. Rep. 99; Judge WALLACE, in *The Baker,* 25 Fed. Rep. 774; the supreme court in *The Blackwell,* 10 Wall. 13, and in *Cope* v. *Dry Dock Co.,* 119 U. S. 628, 7 Sup. Ct. Rep. 336,—clearly present the rules which govern in these cases. The application of the rules creates the difficulty. No two cases are ever alike. Each case must be governed by the special circumstances surrounding it, and the final impression left upon the mind after consideration of them. Of the elements which make up the award the chief, and, it may be, the most important, is the danger from which the salved property was rescued. It must pay the price; what was this service worth to it?
   In the case at bar, the Pomona, a three-mast propeller, left Port Maria, in Jamaica, on her regular trip to New York, about the 3d of March, 1888. She was of 170-tons burden, 150 feet long, 21 feet beam, and 18 feet in depth. Her cargo consisted of coffee, bananas, and annatos. Shortly after the commencement of her voyage she met tempestuous weather, and on the 8th of March broke the tail-end of her shaft. This rendered the propeller useless, and in a day or two she lost her propeller. Having a full complement of sails, she attempted to prosecute her voyage. In despite of all her efforts, buffeting with the winds and waves, she was constantly driven from her course, became at times unmanageable, not obeying her helm, frequently drifting, and exposed to oft-recur-

ring storms. Although during this time she did not leak, and behaved admirably, and there is no evidence that her master and crew had lost heart, yet the log shows that they kept an anxious lookout for a steamer as the only mode of extrication from their trouble. They kept their colors flying on two masts Union down, and used every means of attracting the attention of passing vessels. One steamer, her consort, the Vertumnus, came to her aid, and endeavored to tow her. But after parting a chain and hawser, and injuring the windlass of the Pomona, she was obliged to leave her, and go on her voyage. One or two sailing vessels hailed her, and offered provisions, which were not needed, and therefore declined. They could afford her no other aid. Although several steamers were sighted in the distance, and on one occasion she exchanged signals with a steamer, she was not visited; certainly she found no opportunity, and received no offer of aid from any of them. On the 25th March, the City of New York, one of a line of steamers plying between New York and Galveston, owned by libelants, then out from New York about three days, on her way to the gulf, observed her signals of distress, and went to her aid. The New York had on that trip got out of her usual course some 40 miles to the eastward, and in this way came upon the Pomona. Going along-side of her and learning her disabled condition, and that she wanted to be carried to the nearest port, the New York promptly put out her hawser, took the Pomona in tow, and proceeded at once to the port of Charleston, then being some 246 miles distant, and bearing a little—very little—north of west. The line was made fast between 4 and 5 o'clock on the afternoon of the 25th of March. On the next afternoon, about 5 o'clock, the two ships reached Charleston bar. The master of the Pomona, having lost one anchor at sea, and having but one left, was unwilling to be left outside the bar. So the master of the New York engaged the services of a tug, which carried the Pomona over the bar and into the port of Charleston to a safe anchorage. The weather was excellent after the New York reached the Pomona. The tow was an easy one, both vessels using their sails. Bad weather came on just as they were reaching the Charleston bar, and during the night after leaving her the New York encountered a heavy gale. We see from this that the Pomona had been seriously disabled for 17 days. When she lost her propeller she was in longitude 74 deg. 48 min., latitude 33 deg. 20 min. When the New York reached her she was in longitude 75 deg. 36 min., and latitude 31 deg. 45 min.; that is to say, in 17 days, using her sails, she had gone westward 48 min. of longitude, and had drifted towards the south 1 deg. 35 min. Unable to make any progress, she was equally unable to obtain substantial assistance. Evidently she was out of the direct pathway of steam-ships, and her size prevented her from being easily observed. The presence of the City of New York was due to what is called an accident. Although nothing occurred after the loss of the propeller but the loss of her drag-out at her bow, and an anchor, yet the log shows that her steering apparatus was greatly strained, and she was in imminent danger of losing all control over her movements. Of course it is impossible to say what might have happened to her if the

New York had not come up. It is difficult to escape the conclusion that the property, as well as the lives of those on her, were in grave peril.

The service was rendered by a powerful steam-ship, valued at $225,-000, with as full a cargo as she could carry over the Galveston bar. She was on her regular voyage, on schedule time. She deviated from her voyage, abandoned a course which had been selected by her master for prudential reasons, and came out of her way 240 miles, losing in going and returning at least 48 hours. The most valuable ingredients of her service were the promptness, celerity, skill, and success with which it was performed. These prevented in the smallest time the recurrence of danger. The storm encountered by the New York the night after she left the Pomona, which followed her into the Gulf of Mexico, shows the imminence of that danger. Whether in the deviation she forfeited her insurance, and took the risk of her cargo, does not appear. Neither the policies nor the bills of lading were in evidence. But the master took the risk of this. His conduct cannot be too highly commended. All that he asked was the condition of the Pomona, and the wishes of her master. Without a word he proceeded to relieve the one and comply with the other. His large ship, with a full complement of master, officers, engineers, employes, and crew, 30 in all, was put at her service.

The Pomona, after repairing her injuries, has been valued at $15,000. The repairs cost $2,700. Her cargo is valued at $2,032. We may put the property in peril at $14,330. Here we have a valuable and powerful agent rescuing property of no great value. It is no place for the application of a percentage. It is a matter of regret that courts ever measured salvage services by a percentage. A uniform percentage would work great injustice and inequality. If it be not uniformly applied, the rate always creates discontent. The reasons which have induced the award of salvage, as distinguished from ordinary service, is the allowance "of a generous recompense to the salvors, so as to encourage them, and also to stimulate similar services in others." The service is the relief of property from an impending peril of the sea. Humanity induces the relief whether the value of the property be great or small. The merit of the act consists in the relief, not in the magnitude of the property salved. Perhaps a good mode of measuring salvage services would be to estimate the time consumed and the value of the means and appliances used in the services; then to apply the bounty given by the courts, both as their appreciation of and as an encouragement of such favored services. And if there are, in addition, special circumstances, such as great peril incurred, or great heroism displayed, by the salvors, or a large and valuable property rescued by them, the compensation awarded is to be increased accordingly. Considering all the circumstances of this case as nearly as can be in the method suggested, I award to the libelants, including the sum paid by them to the tug towing the Pomona across the bar at Charleston, the sum of $2,000. The crew have intervened in this matter for their share. The mode of distribution will be determined hereafter. Let an order be prepared carrying this decision into effect. The costs are very small; let them follow the decree.