## THE CITY OF PITTSBURGH.

### MOSSER *v.* THE CITY OF PITTSBURGH

*(District Court, W. D. Pennsylvania. March 26, 1891.)*

1. MARITIME LIENS—REPAIRS.

   An old steam-boat from which the boilers, wheel, engines, and machinery had been removed, and which had been changed into a pleasure barge, having no independent means of propulsion, but intended to be towed by a tow-boat, and to be used in the transportation of excursion parties in the neighborhood of a city, and having her cabins fitted up and used as dancing halls by those who engaged her, is a vessel within the language of Act Pa. April 20, 1858, (P. L. 363,) and Act Pa. June 13, 1836, (P. L. 616,) and as such subject to a lien for materials furnished and work done in fitting and repairing her.

2. SAME—JURISDICTION.

   Such a craft, being intended for the transportation of persons, and therefore engaged in commerce, is a vessel within the maritime law also, and a court of admiralty will take jurisdiction for the enforcement of such lien.

In Admiralty. Libel for repairs.

*Joseph Briel,* for libelant.

*George W. Acklin,* for claimants.

REED, J. This was a libel filed against the City of Pittsburgh, described in the libel as a pleasure barge or boat, by John Mosser, for materials furnished and labor done in and about the fitting and repairing of the said barge or boat, amounting to the sum, after deducting all payments, of $377.45, with interest from July 28, 1890. The amount claimed is not disputed, nor is there any question as to the fact that the materials were furnished and work done as claimed by the libelant. The owners of the boat defend upon the ground that the City of Pittsburgh was not such a vessel as could be proceeded against *in rem,* that the libelant has no lien against a boat of her character and description, and that this court has no jurisdiction, therefore, in this proceeding.

It appears without dispute from the testimony that the City of Pittsburgh, if a vessel, was a domestic vessel, owned and having her home port in the city of Pittsburgh, where the libelant furnished the materials and did the work claimed for in this proceeding. She was originally a steam-boat known as the "Katie Stockdale," engaged in a general freight and passenger business on the Monongahela and Ohio rivers, but some time before these proceedings were commenced her boilers, wheel, engines, and machinery were removed, and the boat was altered and changed into a pleasure barge, still retaining portions of her cabins and upper decks. She has no independent means of propulsion, but when in motion is towed by a steam tow-boat engaged for that purpose. Since her alteration the City of Pittsburgh has been used in the transportation of picnic and excursion parties upon the rivers in the vicinity of Pittsburgh, and her cabins are fitted up and used as restaurants and dancing halls by those who engage her. She was under the care of a master, who, as agent for her owners, contracted for the repairs and alterations made by the libelant.

Two questions arise in this case,—one, whether this is such a vessel as to come within the provisions of the laws of the state of Pennsylvania giving to material-men liens against domestic vessels; and the other, whether it will be recognized as such a vessel in a court of admiralty as that contracts for materials and supplies furnished it will be treated as maritime contracts. The statute of Pennsylvania (Act April 20, 1858, P. L. 363) provides that all ships, steam-boats, or vessels navigating the rivers Alleghany, Monongahela, or Ohio should be liable and subject to a lien in certain cases set forth in the act. It further provides that such a lien should exist for all debts contracted by the owners, agent, or master—

"Of such ships, steam or other boats, or vessels, of whatever kind, character, or description, for or on account of work or labor done or materials furnished by boat-builders, lumbermen, carpenters, * * * in the building, repairing, fitting, furnishing, or equipping such ships, steam or other boats, or vessels, of whatsoever kind, character, or description, as hereinbefore specified and enumerated."

A former statute of the same state (Act June 13, 1836, P. L. 616) provided that—

"Ships and vessels of all kinds, built, repaired, or fitted within the commonwealth shall be subject to a lien for all debts contracted by the masters or owners thereof, for work done or materials found or provided in the building, repairing, fitting, furnishing, or equipping of the same, in preference to any other debt due from the owners thereof."

Under the act last referred to the courts of Pennsylvania have held that a canal-boat is included among the vessels upon which a lien is given for work and materials used in their construction or repair, *Hipple* v. *Canal-Boat Fashion*, 3 Grant, Cas. 40, and in the case of *Parkinson* v. *Manny*, 2 Grant, Cas. 521, the same courts held that a coal-boat was not such a ship or vessel as to be within the meaning of the act of 1836; the court saying that vessels of a permanent and substantial character, such as make repeated voyages, either at sea or upon our rivers and canals, are contemplated by the act, and not such as are merely temporary. That the words "vessels of all kinds" are broad enough to include crafts of every description, great and small. This boat is a vessel, within the meaning of the statutes of Pennsylvania giving the lien, and the libelant is entitled to his lien under those laws.

The remaining question is whether the boat is such a vessel under the maritime law that a court of admiralty will take jurisdiction for the enforcement and collection of the lien. In *Ex parte Easton*, 95 U. S. 68, where the supreme court held that a claim for wharfage was cognizable in admiralty, the court say: "Nor is the nature of the service or the character of the contract changed by the circumstance that the water-craft which derived the benefit in the case before the court was without masts or sails or other motive power of her own." In the case of *Cope* v. *Dock Co.*, 119 U. S. 625, 7 Sup. Ct. Rep. 336, the court held that a claim for salvage services could not be maintained against a dry dock because it was a fixed structure, not used for the purpose of navigation,.

and therefore not the subject of salvage service, any more than was a wharf or a warehouse when projecting into or upon the water. And in the opinion in that case Justice BRADLEY says "It is true that the terms 'ships' and 'vessels' are used in a very broad sense to include all navigable structures intended for transportation;" and he cites an English case in which it was held that a hopper barge, used to receive mud from a dredging machine, and to carry it out to deep water, having no means of locomotion of its own, but towed by other vessels, was included within the term "ship" in the English Merchant Shipping Act; and Justice BRADLEY observes: "Perhaps this case goes as far as any case has gone in extending the meaning of the terms 'ship' or 'vessel.' Still the hopper barge was a navigable structure, used for the purpose of transportation." In *The General Cass*, 1 Brown, Adm. 334, where the libel was filed against a scow or lighter, the court sustained the jurisdiction, saying:

"I think the true criterion by which to determine whether any water-craft or vessel is subject to admiralty jurisdiction is the business or employment for which it is intended, or is susceptible of being used, rather than its size, form, or capacity, or means of propulsion; and there is certainly no reason why it is not navigation, all the same, whether a vessel is propelled by a steam-engine placed within her hull, or by the same engine by means of a tow-line. It is in fact one of the revolutions wrought by the use of steam that it has abolished all distinctions as to propelling power in determining admiralty jurisdiction."

In the case of *The Alabama*, 22 Fed. Rep. 449, the court held that the towage of a steam dredge-boat and her two scows was a maritime service, and Judge PARDEE says:

"The question whether or not the dredge-boat and scows should be classed as a ship or ships; * * * so that the question here is practically one of jurisdiction. * * * The mode of business of said dredge-boat and scows was for the dredge with its machinery to dig the earth out under the water in the channel to be deepened, deposit the earth in the scows, which were then towed to the dumping-ground, unloaded by dumping the earth through their bottoms, and then towed back for the operation to be repeated. The parties to this case have treated the dredge and scows as one thing, one plant, built and operated as one,—as one complete whole, carrying on one business, and having but one purpose. If the parties are right in thus treating the dredge-boat and scows as one craft or thing, then it seems clear that the purpose and business of that craft is largely navigation and water transportation. * * * According to the test authorized by the supreme court in the case of *The Rock Island Bridge*, 6 Wall. 213, the dredge and scows in this case must be movable things engaged in navigation."

In the case of *The Pioneer*, 30 Fed. Rep. 206, the court held that a maritime lien for supplies could be enforced against a steam dredge-boat; Judge BENEDICT saying:

"The absence from the dredge of a natural power of propulsion; the fact that she is not propelled by oars or sails; that she is flat-bottomed; that she is engaged in harbors, rivers, and docks; that she has to be moved to a distance by means of a tug; that she had no power of her own to be moved; that she is not, nor cannot be, a sea or lake going vessel,—neither of these facts, nor all together, require the conclusion that she is not a vessel. The dredge be-

fore the court in this case is adapted to be an instrument of transportation on navigable water, and was used in naval transportation when she transported from place to place the steam shovel and engine, and maintained the same afloat on navigable water, while being used for the purpose of deepening channels."

In the case of *The Old Natchez*, 9 Fed. Rep. 476, it was held that salvage services can be rendered to a dismantled steam-boat moored on a navigable river, and undergoing alterations and repairs for the purpose of being fitted for and used as a wharf-boat, because she was intended to be used in navigation and commerce, and was floated upon the water and movable. In the case of *The Hezekiah Baldwin*, 8 Ben. 556, a floating elevator without independent means of propulsion was held to be a vessel and a subject of maritime lien. In the case of *Endner* v. *Greco*, 3 Fed. Rep. 411, scows carrying ballast to and from vessels in New York bay, although having neither steam-power, sails, nor rudders, and moved by steam-tugs, were held to be vessels, being instruments of navigation and commerce; and Judge CHOATE says:

"Nor is there any valid objection to the jurisdiction in this case growing out of the character of the scows, or the uses to which they were adapted and applied, * * * while these scows are employed in carrying ballast to and from a vessel. That ballast may be considered as their cargo. They are, as it seems to me, properly to be considered vessels, instruments of commerce and navigation, a contract for the repair of which is maritime, because it has relation to trade and commerce, and some connection with a vessel employed in trade."

The proctor for the respondents cited on argument the case of *The Hendrick Hudson*, 3 Ben. 419, in which it appeared that the Hudson was a dismantled steam-boat, stripped of boilers, engines, and paddle-wheels, and which the court held was not a vessel so as to be liable for salvage services. But the facts in that case were that the boat was moored at the shore, became leaky, and grounded, the tide rising and falling in her hull. While in that condition she was used for several months as an hotel or saloon. Afterwards the leaks were stopped up, and she was taken off the shore to be removed to another point on the shores of an island near by. While being towed to her destination the services were rendered claimed for in the case. She was again grounded, and put in use as an hotel. The court held that, although she had once been a vessel in the full sense of the term, and subject to the admiralty jurisdiction of the United States, and although her form and shape under water continued to be those of a vessel, yet in the actual circumstances of her physical existence the court was without jurisdiction *in rem* over her; Judge BLATCHFORD saying: "It was not in any proper sense engaged in commerce or navigation. The test is the actual *status* of the structure as fairly engaged in commerce or navigation."

In the present case the City of Pittsburgh was a movable thing, floating upon the water, of a permanent character, used and engaged in navigation, and as a vehicle for the transportation of persons upon the navigable waters of the United States, and engaged, therefore, in commerce upon navigable waters, for the transportation of persons is

commerce. *Mobile* v. *Kimball*, 102 U. S. 702. While it is true that her voyages were short, and in the vicinity of Pittsburgh, still that does not affect her character, or the jurisdiction of the court of admiralty over her. *U. S.* v. *Ferry Co.*, 21 Fed. Rep. 331; *Murray* v. *The F. B. Nimick*, 2 Fed. Rep. 86. The questions of enrollment, license, and inspection raised by the testimony have no materiality in the determination of the question of jurisdiction or the character of the boat. *The General Cass, supra.* The City of Pittsburgh was a vessel, within the meaning of the term as used in the Pennsylvania statutes and maritime law. The court has jurisdiction to enforce the lien of the libelant under the state laws by this proceeding *in rem*, and the libelant is entitled to a decree for the amount claimed, with interest as claimed, and costs.