**W. F. & R. BOATBUILDERS, Inc., v. HUDSON RIVER STEAMBOAT CO., Inc.**

No. 14328.

District Court, E. D. New York.

Feb. 20, 1935.

William J. Mahar, of New York City, for libelant.

Single, Atkins & Tyler, of New York City (George B. Warburton, of New York City, of counsel), for respondent.

GALSTON, District Judge.

On May 31, 1932, the parties entered into two oral contracts, which provided respectively for the charter of the barges Connecticut and Sarah T. O'Neill, owned by the libelant, to the respondent on a bare boat basis. The boats were in good condition on delivery, but were returned on November 8, 1932, in a damaged condition.

A third cause of action sets forth a second charter of the Sarah T. O'Neill in the early part of May, 1933, the delivery of said boat in good order, and the return on or about December 5, 1933, in a badly damaged condition.

The respondent challenges the jurisdiction of the court, on the ground that the contracts were not enforceable in admiralty.

The respondent's business is to transport cargo and passengers between New York and Albany on board its river steamers, and during the periods in question, owing to conditions at its terminal in Albany, barges were found necessary to extend its pier so as to facilitate the docking of its vessels. There apparently is no doubt that the libelant knew the purposes for which the barges were to be used, and for which they were used. Shaw told one of the Feeneys when the charter was entered into that the barge was to be used to breast off their steamers and pass freight to and from the dock. As actually used, the Sarah T. O'Neill was the inside boat against the dock and was lashed thereto. The Connecticut was the outside boat and was lashed to the Sarah T. O'Neill. Steel cable was used in place of ordinary hawser. Moreover, the Feeneys saw the use to which the barges were put on their visit to Albany.

Again, in 1933, Bayliss of the Hudson River Steamboat Company, Inc., telephoned Feeney of the W. F. & R. Boatbuilders, Inc., that a barge was again needed to breast further out in the stream, to be placed alongside of the respondent's own barges in exactly the same manner as had been done in 1932. The Sarah T. O'Neill was delivered pursuant to this agreement and was placed with the respondent's own barges and used in a manner similar to that practiced in 1932.

Although the proof discloses also that cargo at times was taken from respondent's steamers, such as sugar, and placed in the barges during the time of unloading, and thereafter taken to the respondent's shed adjoining its dock on land, it appears that neither the Connecticut nor the Sarah T. O'Neill was used by the respondent to carry cargo nor in any other wise engaged in navigation except as heretofore indicated.

The respondent's position is that the contract was not a maritime contract; that the boats chartered were used merely as additions to the pier; and that in consequence any injury to them, under the authority of The Haxby (D. C.) 94 F. 1016, is not cognizable in admiralty. It is contended that the libelant's barges lost their identity as vessels and were converted into a structure to extend the land. Robinson v. The C. Vanderbilt (D. C.) 86 F. 785. It is said that these barges were nothing more than floating wharves within the principle of The Robert W. Parsons (Perry v. Haines), 191 U. S. 17, 24 S. Ct. 8, 48 L. Ed. 73; Hayford v. Doussony et al. (C. C. A.) 32 F.(2d) 605.

The closest case on the facts is The Milwaukee (D. C.) 15 F.(2d) 886, 1926 A. M. C. 1627. The contract in that case provided for the storage of grain in the hold of a ship laid up for the winter; and it was held that since the vessel was not engaged in commerce or navigation nor in preparation therefor, admiralty had no jurisdiction. In (D. C.) 33 F. 383, and The Richard Winslow that case Judge Hazel followed The Pulaski (C. C. A.) 71 F. 426.

In Cope v. Vallette Dry-Dock Co., 119 U. S. 625, 7 S. Ct. 336, 337, 30 L. Ed. 501, the structure considered was a dry dock permanently moored by means of chains to the back of the river and sparred off from the bank to keep it afloat. It appeared that the structure was not designed for navigation and could not be practically used therefor. It was said in the opinion: "A fixed structure, such as this dry-dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a wharf or a warehouse when projecting into or upon the water. The fact that it floats on the water does not make it a ship or vessel, and no structure that is not a ship or vessel is a subject of salvage."

In The Richard Winslow (C. C. A.) 71 F. 426, 428, the tests are clearly stated: "Finally, in 1870, in New England Mut. Insurance Co. v. Dunham, 11 Wall. 1 [20 L. Ed. 90], by the unanimous concurrence of

934

the judges, the position of Judge Story was fully sustained, and the court declared the true criterion of admiralty jurisdiction with respect to contracts 'is the nature and subject-matter of the contract as whether it was a maritime contract having reference to maritime service or maritime transactions.' A maritime contract must therefore concern transportation by sea. It must relate to navigation, and to maritime employment. It must be one of navigation and commerce on navigable waters. Unquestionably there was here a contract for carriage by sea, and that contract was maritime in its nature. But there was joined with it a contract with respect to the cargo after the completion of the voyage that was in no respect maritime in its nature. If as Judge, now Mr. Justice, Brown observes in The Pulaski [D. C.] 33 F. 383, the storage were a mere incident to the transportation, the entire contract would be held to be maritime, and within the admiralty jurisdiction. But here the contract for holding the corn in storage did not concern navigation. It could not take effect until after completion of the voyage, and had no relation to further transportation of the cargo by the vessel. It was to be performed at a time when the vessel was not engaged in commerce or navigation, or in preparation therefor. It was merely a contract for winter storage, and was no more maritime in its nature than the non-maritime contracts for winter wharfage (The Murphy Tugs [D. C.] 28 F. 429); for the employment of a dismantled hull (The Hendrick Hudson, 3 Ben. 419, Fed. Cas. No. 6,355); for the storage of a vessel's outfit during winter (Gilbert Hubbard & Co. v. Roach [C. C.] 2 F. 393); or for the service of a shipkeeper during winter (The Sirius [D. C.] 65 F. 226). The reason is that such service does not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation."

Applying these tests to the facts in the cause before us, it would seem that the use of the barges was no more one of navigation and commerce than was the pier itself to which the barges were attached. They were an addition to the pier and did not lose that identity because they rose and fell with the tide. Nor was the temporary storage of cargo during the unloading of the respondents such as to destroy the main purpose of their employment. Indeed, these grain storage cases that have been referred to go much further in holding that the storage throughout the winter on a vessel laid up for the winter is not a contract maritime in its nature. In essence, what the respondent did was to extend its pier at Albany to facilitate the unloading of its steamers at the terminal. It so happens that the extension was in the form of floating boats, but the structure was, nevertheless, an extension of the dock, as the contract contemplated.

For these reasons I have reached the conclusion that the libel must be dismissed.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.