**J. M. L. TRADING CORP. and Walter Olsson, Plaintiffs,**

v.

**MARINE SALVAGE CORPORATION and Four (4) Floating Wooden Drydocks, Defendants.**

Civ. No. 80–1909.

United States District Court, E. D. New York.

Nov. 25, 1980.

Boyle, Feller & Hirsch, New York City, for plaintiffs.

Boal, Doti & Larsen, New York City, for Marine Salvage Corp.

## MEMORANDUM and ORDER

PLATT, District Judge.

Plaintiffs have moved for an interlocutory sale of four floating wooden drydocks which have been harbored at J.M.L. Trading Corp. ("J.M.L.") wharves on Staten Island since October, 1979. It is undisputed that Marine Salvage Corp. ("Marine Salvage"), owner of the drydocks, have not paid the wharfage fees since February, 1980, and the charges for pumping services provided by plaintiff Walter Olsson since May, 1980. Plaintiffs allege that these drydocks are subject to admiralty jurisdiction (28 U.S.C. § 1333), that a maritime lien has attached to them for wharfage and pumping service charges, and that an interlocutory sale is called for by the circumstances. This Court has held a number of hearings in this matter to attempt to resolve the dispute and, at this time, the sole issue left to be determined is whether those floating wooden drydocks are ships or vessels subject to this Court's admiralty jurisdiction.

### I

While the facts are not in dispute, a brief outline of the history of these drydocks is useful to an understanding of this Court's conclusions of law concerning jurisdiction in this matter.

The floating drydocks in question were built for the United States Navy for use in World War II. Apparently, like a great many of the floating drydocks so built and used, they were towed from place to place as needed. Eventually, Marine Salvage purchased these particular drydocks from Todd Shipyard of Brooklyn and, because Todd wanted the drydocks moved, Marine Salvage had them towed across navigable water to J.M.L.'s wharves on Staten Island to be moored pursuant to an agreement whereby Marine Salvage would pay wharfage fees of $2,000 per month. This arrangement was understood to be temporary while Marine Salvage completed resale negotiations with an interested buyer at another marine location. In other words, the drydocks were in transit and were to be moored only until their resale. Unfortunately for both parties, no resale agreement was reached and in February, 1980 Marine Salvage stopped paying the wharfage fees and in May tendered no more monies to plaintiff Olsson for pumping services.

### II

The great majority of decisions concerning the "reach" of admiralty jurisdiction over drydocks have held that drydocks *when in use as drydocks* are not ships or vessels subject to such jurisdiction. *See e. g., Cope v. Vallette Dry Dock Co.,* 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887); *DeMartino v. Bethlehem Steel Co.,* 164 F.2d 177 (1st Cir. 1947); *Berton v. Tietjen & Lang Dry Dock Co.,* 219 F. 763 (D.N.J.1915). The principle of law which may be gleaned from these rather aged cases is that when a floating drydock is more or less permanently affixed to the shore, it is not within admiralty jurisdiction primarily because it does not travel upon navigable waters, has no motive power of its own, and has no steering mechanism of its own. As the Fourth Circuit stated in interpreting these decisions "the drydock in service, permanently moored to the land, has most of the attributes of . . . an extension of the land

[such] as a wharf or a dock." *United States v. Moran Towing & Transportation Co.*, 374 F.2d 656, 662 (4th Cir. 1967). Nevertheless, as the Fourth Circuit panel added, a drydock "does not retain that character when it has been severed from its attachments to the land and when, under tow, it is moving over navigable waters . . . ." *Id.* at 662.

■ Granting the fact that the Fourth Circuit was construing the term "vessel" for the purpose of the Wreck Act and that, in the instant case, we are dealing with the meaning of the term for maritime lien purposes, we nevertheless think that the proper way to treat this jurisdictional question is not to assume that a floating drydock is for all time and for all reasons never to be considered a "ship" or "vessel" for admiralty purposes. Rather, as the Fourth Circuit has indicated, when a floating drydock is treated like a ship or vessel and is used like one, thereby losing its attributes as an extension of the land, it may very well be found to be within the admiralty jurisdiction of the Federal courts.[1]

■ Assuming arguendo, in this day and age[2] (as contrasted to the situation in 1887 when the *Cope* decision was handed down), that a floating drydock may, under some circumstances where it is permanently affixed to the shore or to wharves or piers and is in use for its intended purposes, be deemed not to be a vessel during such period of fixture and use because it is, in essence, a graving dock of yore, nonetheless such is not the case here. The facts of this situation compel the conclusion that these four floating drydocks are subject to the

---

1. The Fifth Circuit has also indicated that there might be some circumstances in which a floating drydock might not be excluded from the reach of admiralty jurisdiction. *See Cook v. Belden Concrete Products, Inc.*, 472 F.2d 999, 1001 (5th Cir. 1973).

2. Since World War II, if not before, "drydocks" of various sizes and shapes and for use in repairs of boats, crafts, vessels and ships of various magnitudes and descriptions have been navigated, towed or otherwise propelled all over the world. To maintain the 19th Century fiction that they are not vessels seems to this Court, to put it mildly, unreasonable. Indeed were we called upon to predict which way the Supreme Court would today decide the simple question of whether a floating drydock, even though affixed to shore and in use, was a vessel, our answer would be in the affirmative.

A look at The World Book Encyclopedia- although not necessarily authoritative–proves to be useful. There the distinction is made quite clearly between a permanently affixed drydock, i. e., a graving dock, and a floating drydock as follows:

"*Graving Docks* are used chiefly to repair large ships in shipyards. *Graving* was a term used in the days of wooden ships to mean cleaning a vessel's bottom and coating it with tar. A graving dock looks like a huge, concrete bathtub sunk into the ground. One end of the dock opens onto a harbor, river or other waterway. When a ship enters the dock, shipyard workers place a huge floating or sliding *caisson*, or gate, against the open end. Pumps send the water out and the vessel slowly sinks. Its *keel*, or bottom, comes to rest on wooden blocks placed on the floor of the dock. These blocks support the ship. *Spars*, or long pieces of wood wedged between the ship and the sides of dock, also help support the vessel. When repairs are completed, workers flood the dock until the water reaches the same level as the water outside the gate. It is opened and the ship leaves."

(Underneath a picture of a large floating dry dock in which is housed a naval ship of considerable size the following description of a floating dry dock is given):

"*Floating Docks* can be self–propelled or towed from place to place. They are important in war to repair ships in forward battle areas. A floating *dock* looks like a shoebox with the top and ends removed. Some types are built in U–shaped sections that can be assembled so to make one large dock. The *hull*, or bottom, and *wingwalls*, or sides, of a floating dock contain compartments. Water enters these compartments, making the dock sink low enough to allow a ship to enter. Pumps then suck the water out and the dock rises, lifting the ship out· of the water. Wooden blocks and spars similar to those used on graving docks help support the vessel. When repairs are completed, the compartments are flooded again until the dock sinks enough to allow the ship to float. Such docks can raise an average ship in from one to two hours."

The inscription alongside the picture states that "*Floating Dry Docks* were used by the United States Navy during World War II. Dry docks such as this played a vital part in the war in repairing battle–damaged ships. Without them, the ships would have had to travel thousands of miles to reach the navy yards and the naval bases in the United States."

Court's admiralty jurisdiction. First, these floating drydocks are exceptionally mobile having been towed all over the world during World War II. Second, they have been towed across navigable waters to their present berth. Third, they are not, and have not been, in any time period relevant to this case, in use as drydocks. Fourth, these drydocks were and are mid–voyage, being temporarily harbored by Marine Salvage until resold whereupon they would have been towed to another location. Fifth, J.M.L. treated these drydocks like any other vessels moored to its wharves, and sixth, pumping services had to be provided to keep these drydocks afloat. In our view, the totality of these factors and circumstances indicate that they are subject to maritime jurisdiction.

These four floating drydocks are not permanently affixed to the land as in the *Cope* case, nor are they in use as drydocks as in the *Berton* case. Rather, they have been temporarily moored, in mid–point of a trip over navigable waters, have taken up space at a wharf used by "ships" and "vessels", have been treated like any other vessel by J.M.L., and would interrupt the normal flow of navigation and commerce if they were not so treated. This Court can see very little practical difference between the facts of the instant case and those of the *Moran* case where the Fourth Circuit held that floating drydocks in transit across navigable waters were vessels within admiralty jurisdiction. Consequently, this Court finds on the facts of this case that these floating drydocks were being treated for all practical purposes like "ships" or "vessels" and are therefore within this Court's admiralty jurisdiction. Therefore, plaintiff's motion for the sale of these four drydocks to satisfy the valid maritime liens attached thereto must be, and hereby is, granted unless defendant obtains a stay of such sale from the Court of Appeals within the next ten days.

So ordered.