Lanny Paul THERIOT

v.

ST. MARTIN, LIRETTE, GAUBERT & SHEA and/or St. Martin Land & Development Corporation and The Travelers.

Civ. A. No. 88–2284.

United States District Court, E.D. Louisiana.

Jan. 9, 1989.

Michael J. Samanie, David B. Allen, Trial Atty., Samanie, Barnes & Allen, Houma, La., for plaintiff.

Grady S. Hurley, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for St. Martin Land & Development Corp. and The Travelers.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came on for hearing December 7, 1988 on motion of defendant St. Martin Land & Development Corporation for summary judgment and/or dismissal on the grounds that plaintiff lacked seaman status under the Jones Act, 46 U.S.C.App. § 688. Having considered the memoranda submitted by the parties as well as other applicable law, the Court hereby GRANTS the motion for summary judgment.[1]

---

1. This motion was brought on behalf of defend- ant St. Martin Land & Development Corpora-

## I.

Plaintiff Lanny Theriot was employed to perform various maintenance related tasks aboard a hunting and fishing camp owned by defendant St. Martin Land & Development Corporation.[2] The camp, christened THE RICH AND THE WORTHLESS, consisted of living quarters built on top of a steel deck mounted on pontoons, with the rake end of a barge welded onto the ends of the pontoons.[3] The camp had no motive power of its own and no navigational aids.[4] However, the camp was equipped with a bilge pump, a VHF radio, three life jackets, mooring lines and spuds.[5] During the period in which plaintiff worked aboard, the camp was moved alternately between a hunting lease at Huth Canal during the winter months and a fishing lease at Last Island during the summer months, with occasional stops in Houma for maintenance.[6] When on location at one of the leases, the camp would be moored by dropping the spuds into the shallow marsh bottom. No separate mooring lines were used. When the camp was to be moved, the spuds would be raised and the camp towed by tug to its alternate location.[7] Plaintiff had been employed aboard THE RICH AND THE WORTHLESS for approximately one year when he allegedly injured his back on March 24, 1987 while attempting to lift a suction pump used to wash down the deck.[8] The camp was spudded into place at the time of the alleged accident.[9]

Thereafter, plaintiff continued to work aboard the camp intermittently until his employment was terminated sometime in January 1988.[10] Plaintiff subsequently filed this action against the defendants St. Martin, Lirette, Gaubert & Shea and St. Martin Land & Development Corp. asserting claims under the Jones Act and general maritime law for the unseaworthiness of THE RICH AND THE WORTHLESS and for maintenance and cure.

## II.

The current test for seaman status is as follows:

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel ... or performed a substantial part of his work on a vessel; and (2) if the capacity in which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for future trips.

*Barrett v. Chevron*, 781 F.2d 1067, 1072 (5th Cir.1986) (quoting *Offshore Co. v. Robison*, 266 F.2d 769 (5th Cir.1959)).

■ The issue of seaman status has been described as a mixed question of law and fact and also as a question whose

---

tion only, thus the Court's judgment herein pertains solely to that defendant.

**2.** See Deposition of Lanny Paul Theriot at pp. 54–59, 68–69, attached as Exhibit A to plaintiff's Memorandum in Opposition to Motion for Summary Judgment. Plaintiff is not certain which of the defendants employed him, or which of the defendants owned the camp in question. However, plaintiff's paychecks were drawn on the account of St. Martin, Lirette, Gaubert & Shea, and the owner of the camp is listed as St. Martin Land and Development Corporation on defendant's maritime survey. See id. at pp. 104–14; Rivers and Gulf Marine Survey attached as Exhibit A to Defendant's Motion for Summary Judgment [hereinafter "Survey"].

**3.** Plaintiff's Depo. at pp. 66–67. See also Survey at p. 2. The descriptions contained in the Survey are unopposed by plaintiff. See Plaintiff's

Memorandum in Opposition to Summary Judgment at pp. 2–3.

**4.** Plaintiff's Depo. at pp. 84–85 & 111. See also Survey at p. 2.

**5.** Survey at pp. 2, 4 & 6. See also Plaintiff's Depo. at pp. 73–77. Plaintiff refers to the bilge pump designated as such in the Survey as a "suction pump."

**6.** Plaintiff's Depo. at pp. 68–69, 72–73.

**7.** *Id.* at pp. 64–66.

**8.** *Id.* at p. 73.

**9.** *Id.* at p. 85.

**10.** *Id.* at pp. 88, 92.

resolution requires the application of legal principles to specific underlying facts.[11] Although the issue of seaman status is normally a question for the jury,[12] summary judgment is proper on the issue of seaman status where the underlying facts are undisputed and the record reveals no evidence from which reasonable persons might draw conflicting inferences.[13] Summary judgment has been found appropriate in cases wherein the judgment required a determination of one or more of the various factors needed to establish seaman status.[14] Where the facts upon which summary judgment on seaman status is based are undisputed, the function of the Court is to "review them to determine whether reasonable persons might draw conflicting inferences." *Bertrand, supra,* 700 F.2d at 244.

### III.

 The issue presently before the Court is whether THE RICH AND THE

WORTHLESS (hereinafter TRATW) can be considered a vessel for purposes of the Jones Act. "The existence of a vessel, as a fundamental prerequisite to Jones Act jurisdiction, is central to the test of seaman status." *Bernard v. Binnings Const. Co.,* 741 F.2d 824, 828 (5th Cir.1984). Despite the importance of the role a vessel plays in the application of the Jones Act, there is yet no settled definition of the term.[15] The term "vessel" has been applied to "a variety of special purpose structures, far removed from the conventional notion of ships and seagoing vessels," which structures have been held to satisfy the requirements of the Jones Act. *Id.* at 829.[16] In determining whether a special purpose structure is a vessel, the considerations are the purpose for which the craft is constructed and the business in which it is engaged.[17]

**11.** *See Bertrand v. Int'l Mooring & Marine,* 700 F.2d 240, 244 (5th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *Holland v. Allied Structural Steel Co.,* 539 F.2d 476, 483 (5th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1136, 51 L.Ed.2d 557 (1977). *See also Ardoin v. J. Ray McDermott & Co.,* 641 F.2d 277, 280 (5th Cir.1981); *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342, 1345 (5th Cir.1980).

**12.** Id. (citing *Barrios v. Engine & Gas Compressor Serv., Inc.,* 669 F.2d 350, 352 (5th Cir.1982); *Watkins v. Pentzien,* 660 F.2d 604, 606 (5th Cir.), *cert. denied,* 456 U.S. 944, 102 S.Ct. 2010, 72 L.Ed.2d 467 (1981); *Robison, supra,* 266 F.2d at 779–80).

**13.** Id. (citing *Abshire v. Seacoast Prod., Inc.,* 668 F.2d 832, 835 (5th Cir.1982); *Ardoin, supra,* 641 F.2d at 280; *Guidry v. Soloco, Inc.,* 614 F.2d 447, 454 (5th Cir.1980); *Landry v. Amoco Prod. Co.,* 595 F.2d 1070, 1072 (5th Cir.1979); *Robison, supra,* 266 F.2d at 779–80.)

**14.** For cases in which summary judgment has been affirmed because the structure involved was found not to be a vessel, *see, Hemba v. Freeport McMoran Energy Partners, Ltd.,* 811 F.2d 276 (5th Cir.1987); *Waguespack v. Aetna Life & Cas. Co.,* 795 F.2d 523 (5th Cir.1986); *Bernard v. Binnings Const. Co.,* 741 F.2d 824 (5th Cir.1984); *Barrios, supra,* 669 F.2d 350; *Smith v. Massman Const. Co.,* 607 F.2d 87 (5th Cir.1979); *Leonard v. Exxon Corp.,* 581 F.2d 522 (5th Cir.1978), *cert. denied,* 441 U.S. 923, 99 S.Ct. 2032, 60 L.Ed.2d 397 (1979); *Cook v. Belden Concrete Products,* 472 F.2d 999 (5th Cir.1973); *Atkins v. Greenville Shipbuilding Corp.,* 411 F.2d

279 (5th Cir.), *cert. denied,* 396 U.S. 846, 90 S.Ct. 105, 24 L.Ed.2d 96 (1969). For cases affirming summary judgment for lack of permanent assignment to or substantial work upon a vessel, *see, Guidry v. Continental Oil Co.,* 640 F.2d 523 (5th Cir.1981), *cert. denied,* 454 U.S. 818, 102 S.Ct. 96, 70 L.Ed.2d 87 (1981); *Billings v. Chevron U.S.A., Inc.,* 618 F.2d 1108 (5th Cir.1980); *Longmire v. Sea Drilling Corp.,* 610 F.2d 1342 (5th Cir.1980).

**15.** Attempts to fix unvarying meanings having a firm legal significance to such terms as "seaman," "vessel," "member of a crew" must come to grief on the facts. *Robison, supra,* 266 F.2d at 779.

**16.** *See, e.g., Hicks v. ODECO,* 512 F.2d 817 (5th Cir.1975) *cert. denied sub nom. Hughes v. ODECO,* 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976) (affirming jury determination that submersible oil storage facility is a vessel); *Producers Drilling Co. v. Gray,* 361 F.2d 432 (5th Cir. 1966) (affirming directed verdict that submersible drilling barge is a vessel); *Offshore Co. v. Robison, supra,* 266 F.2d 769 (affirming jury determination that mobile drilling platform with retractable legs is a vessel).

**17.** *See Hemba v. Freeport McMoran Energy Partners, Ltd., supra,* 811 F.2d at 277; *Bernard v. Binnings Const. Co., supra,* 741 F.2d at 829; *Barrios v. Engine & Gas Compressor Serv., Inc., supra,* 669 F.2d at 353; *Blanchard v. Engine & Gas Compressor Serv., Inc.,* 575 F.2d 1140, 1142 (5th Cir.1978); *Hicks v. ODECO, supra,* 512 F.2d at 823.

## IV.

■ Turning now to the instant case, the contentions of the parties regarding the status of TRATW are as follows. Plaintiff characterizes the camp as a special purpose vessel and analogizes its operation to that of a drilling barge, which although immobilized for the duration of an intended drilling operation, may thereafter be relocated by marine transportation to a new drilling site.[18] According to the plaintiff, the special purpose of TRATW was to provide a mobile base of operations capable of movement across inland waters; its business was to provide a base of operations for hunting expeditions at Huth Canal in the winter months and fishing expeditions at Last Island in the summer months.[19] Thus the gravamen of plaintiff's contention is that the amphibious nature of the camp is determinative of its vessel status, i.e., TRATW is in reality a vessel built for the purposes of transporting the camp through the Louisiana marshes.

On the other hand, defendant analogizes TRATW to a floating work platform, a structure long held not to meet the requirements of a vessel.[20] The *Bernard* Court reviewed the jurisprudence on this issue and found the following three factors common to the decisions:

(1) The structures involved were constructed and used primarily as work platforms;

(2) They were moored or otherwise secured at the time of the accident; and,

(3) Although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

741 F.2d at 831.

The defendant urges TRATW meets these criteria: (1) TRATW was designed as a hunting and fishing camp, to be spudded down in shallow marsh waters; (2) the camp was actually spudded down at the time of the alleged injury; and (3) during the course of plaintiff's employment, TRATW was moved only three times; from Houma to Last Island, from Last Island to Houma for maintenance, and from Houma to Huth Canal; illustrating that any transportation function of the camp was incidental to the primary purpose of serving as a base for hunting and fishing trips.[21]

The Court concludes and finds that just as a floating work platform is not considered a special purpose vessel, TRATW should also not be considered a special purpose vessel. Traditional indicia of vessel status include motive power, navigation lights, instruments, living quarters, bilge

---

**18.** *See, e.g., Producers Drilling Co. v. Gray, supra,* 361 F.2d 432 (submerged drilling barge used as drilling platform, would refloat itself at termination of operation); *Offshore Co. v. Robison, supra,* 266 F.2d 769 (drilling barge with retractable legs to raise itself out of the water).

**19.** *See* Plaintiff's Memo at 5.

**20.** The following cases held the structures involved were not vessels: *Cope v. Vallette Drydock Co.,* 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (dry-dock); *Atkins v. Greenville Shipbuilding Corp., supra,* 411 F.2d 279 (dry-dock); *Cook v. Belden,* 472 F.2d 999 (floating fabrication barge); *Leonard v. Exxon Corp., supra,* 581 F.2d 522 (floating construction platform); *Watkins v. Pentzien, Inc.,* 660 F.2d 604 (barges used as construction platforms); *Barrios v. Engine & Gas Compressor Serv., Inc., supra,* 669 F.2d 350 (compressor station mounted on submerged barge); *Bernard v. Binnings Const. Co., supra,*

741 F.2d 824 (work punt sixteen by four feet); *Waguespack v. Aetna Life & Cas. Co., supra,* 795 F.2d 523 (permanently moored floating tender platform).

**21.** The record shows the camp was moved a total of six times during the entire course of plaintiff's employment thereon: (1) Houma to Last Island in the summer of 1986 (Plaintiff's Dep. at 61–62); (2) Moved to deeper water to replace generator during the summer of 1986 (*Id.* at 68); (3) Last Island to Houma for maintenance in fall of 1986 (*Id.* at 69); (4) Houma to Huth Canal in October of 1986 (*Id.* at 69–70); (5) Huth Canal to Houma for maintenance in spring of 1987 (*Id.* at 72); and (6) Houma to Last Island in spring of 1987 (*Id.* at 72). However, the camp's ability to float and its movement across the water in the normal course of its business do not determine vessel status. *Cook v. Belden Concrete Products, supra,* 472 F.2d at 1001.

pumps and raked bows.[22] It is undisputed TRATW did not possess its own motive power, navigation lights or equipment, rudders or radar.[23] Nor was TRATW registered with the Coast Guard. Although the camp did possess living quarters, a bilge (or "suction") pump, a VHF radio, life jackets and a raked bow, the only one of those attributes directly pertaining to the vessel status of TRATW and tending to indicate the camp may have been built for the purpose of navigation is the raked bow section. The living quarters, the pump, the life jackets, and the radio are simply necessary adjuncts to the use of TRATW as a remotely located waterborne hunting and fishing camp, which must be, of necessity, self-reliant.[24] The raked bow compartment served also to hold diesel fuel tanks for a diesel-powered electric generator. The mere presence of this raked bow section which also served such an additional purpose does not dictate the conclusion that TRATW was designed for use in navigation and commerce, especially when the evidence supports a conclusion directly to the contrary.

■ The undisputed evidence before the Court shows TRATW was used exclusively for sporting and pleasure purposes and thus any transportation function would have necessarily been purely incidental.[25] The evidence does not indicate the trips to Houma were for any purposes other than maintenance.[26] The modus operandi of THE RICH AND THE WORTHLESS was as follows: After the camp was towed to its intended destination, the spuds were dropped and the camp thereafter remained immobile until such time as maintenance or change of season required its relocation. The business of TRATW was to serve as a platform or base from which hunting and fishing expeditions could be conducted; the evidence demonstrates it was clearly not designed for the purposes of navigation and commerce. The sole purpose of TRATW was to serve as an insular hunting and fishing camp, requiring self sufficiency as far as possible, and the practical necessity for storing diesel fuel in the raked bow section to run the electric generator for camp appliances is not sufficient to confer vessel status. Other than plaintiff's testimony that he rode the camp from Houma to Last Island on one occasion on which he "sat on the houseboat and made sure everything went all right," there is no evidence before the Court to support the supposition TRATW performed transportation functions. In fact, no evidence is presented nor any allegation made that TRATW performed any sort of transportation function whatsoever. That TRATW, just as the work platform in *Bernard v. Binnings Const. Co., supra*, was moved on a fairly regular basis does not of itself create vessel status. "[O]ur decisions make clear that a structure whose primary function is to serve as a work platform does not become a vessel even if it sometimes moves significant distances across navigable waters in the course of normal operations." [27]

In summary, the Court concludes sport and pleasure use was the only business in which TRATW was engaged during the period for which plaintiff was employed aboard and any possible transportation function the TRATW may have performed was clearly incidental to such use.

### V.

For the foregoing reasons, the Court GRANTS the motion of St. Martin Land &

---

**22.** See *Smith v. Massman Const. Co.*, 607 F.2d 87 (5th Cir.1979); *Blanchard, supra,* 575 F.2d at 1142.

**23.** Plaintiff's Dep. at p. 85; Survey at pp. 1–3.

**24.** In his deposition, plaintiff stated the pump in question was used to wash down the deck, and there is no evidence that the pump was used for any other purpose. For such use, the pump could serve just as well on a pier or dock or any other waterside facility. The same reasoning holds true for the life jackets. The pump was gratuitously characterized as a "bilge" pump in defendant's marine survey. Furthermore, plaintiff's description of his duties did not include pumping out the bilges. See Plaintiff's Dep. at pp. 54–56, 73–77; Survey at p. 4.

**25.** See Plaintiff's Dep. at pp. 68, 71, 104, 106–07.

**26.** *Id.* at pp. 69, 72.

**27.** *Bernard v. Binnings Const. Co., supra,* 741 F.2d at 832 (citing *Leonard v. Exxon Corp., supra,* 581 F.2d at 522; *Cook v. Belden, supra,* 472 F.2d at 999).

Development Corporation for summary judgment dismissing plaintiff's complaint as to that defendant only at plaintiff's cost.