Nancy D. WHITE, Plaintiff–Appellee,

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,** Defendant–Appellant.

No. 89–1530.

United States Court of Appeals, Fourth Circuit.

Argued April 4, 1990.

Decided Sept. 10, 1990.

D. French Slaughter, III, argued (Jay T. Swett, McGuire, Woods, Battle & Boothe, on brief, Charlottesville, Va.), for defendant-appellant.

Lawrence Bradford Chandler, Jr., Chandler, Franklin & O'Bryan, Charlottesville, Va., for plaintiff-appellee.

Before HALL and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

The case presents us with two questions: (1) whether the district court below had jurisdiction to issue a declaratory judgment regarding the amount of uninsured motorist insurance available to an insured prior to the adjudication of liability against the underinsured tortfeasor; and (2) whether

the district court was correct in holding that the insured failed to reject the default level of coverage imposed by Virginia's Uninsured Motorist Law. Answering both questions in the affirmative, we affirm the judgment of the district court.

## I.

On December 17, 1984, Nancy D. White, a truck driver employed by Manville Corporation, was acting within the scope of her employment when her tractor-trailer was involved in an accident with a vehicle being driven by Carolina Peace. White was seriously injured and subsequently instituted an action against Peace in New Jersey state court. Peace's insurer, State Farm Insurance Company, tendered $50,000, the full limits of the policy. That action was stayed pending outcome of the present case, which White filed to determine the limits of Manville's uninsured motorist ("UM") insurance.[1]

Manville had obtained liability insurance for its fleet of vehicles from National Union Fire Insurance Company through insurance broker Frank B. Hall & Co. ("Hall"). The policy provided for liability coverage of $2,000,000 per accident. A declaration to the policy provided that, in states mandating UM coverage, Manville was insured for the basic limits required in that state. An endorsement to the policy specified that in Virginia, National Union's UM liability was limited by the amount specified in the declaration.

National Union had sent certain forms to Manville relating to Manville's desired UM coverage in forty-eight states and the District of Columbia. Melvin D. Furman, Director of Risk Management for Manville, filled out the forms. One form, which did not relate to Virginia, listed thirty-nine states and the District of Columbia and allowed Manville to reject UM coverage, select basic minimum limits, or choose another amount of coverage for each of the states. Furman completed the multistate form, rejecting UM coverage where possible and selecting the minimum coverage in states that required UM coverage.

Nine other forms also questioned Manville's desired UM coverage. Each of these forms dealt with only one state; one dealt with Virginia. The Virginia form listed three options relating to UM coverage:

A. Uninsured Motorists Insurance Limit equal to policy's Bodily Injury Liability Limit;

B. Uninsured Motorist Insurance Limits desired (other than A above) $_____ but not less than $60,-000 for bodily injury liability;

C. Uninsured Motorists Insurance is not wanted and is hereby rejected.

Furman signed and returned the Virginia form but failed to check one of the three options. Aside from Furman's failure to select an option, the form was defective in two other respects. First, option C, a rejection of UM, was not legally available to Manville because Virginia law provided for a minimum level of coverage. *See* Va.Code Ann. § 38.1–381(b) (1981). Second, the form incorrectly listed the minimum amount of UM as $60,000 in option B; the minimum amount of UM coverage required in 1984 was $25,000 per person and $50,000 per accident. *Id.*

Virginia law, during policy year 1984, provided that the limits of a motor vehicle insurance policy's UM coverage shall not be less than the limits of that policy's liability coverage "unless the insured rejects such additional uninsured motorist coverage by notifying the insurer as provided in § 38.1–380.2(B)(3)." Va.Code Ann. § 38.1–381(b) (1981). Section 38.1–380.-2(B)(3) required the insured to notify the insurer of the rejection within twenty days of the issuance or renewal of the policy. If an insured did reject the default coverage, the insured was still insured for the minimum amount required under Virginia law —$25,000 per person and $50,000 per accident. Va.Code Ann. § 38.1–381(b). The provisions have since been recodified at

---

1. The uninsured motorist insurance at issue here covers damages caused by an underinsured motor vehicle.

§§ 38.2–2206 and –2202 of the Virginia Code.

On July 27, 1989, the United States District Court for the Western District of Virginia entered summary judgment in favor of White, holding that Manville's UM coverage was $2,000,000, the amount of liability coverage under the policy. 715 F.Supp. 1339. Because the court found that Manville had not rejected the default coverage, Virginia law required National Union to provide UM coverage equal to the liability coverage.

National Union has appealed. National Union contends that Manville did reject the default level of UM coverage. It also contends that the district court did not have subject matter jurisdiction to issue a declaratory judgment. We address National Union's jurisdictional argument first.

## II.

National Union argues that the district court did not have subject matter jurisdiction to issue a declaratory judgment relating to the amount of UM coverage available to White on the National Union policy. It claims that the case does not present a justiciable controversy because White only seeks a determination of the amount of coverage Manville obtained from National Union. The issue, argues National Union, is speculative until White obtains a judgment against the tortfeasor, Peace, in an amount that exceeds Peace's liability insurance.

White alleges that, except for insurance, Peace is "judgment proof." White argues that it would make no sense to try the case against Peace, perhaps obtaining a judgment of several hundred thousand dollars, if only $50,000 was available to be paid. White made a $300,000 demand on National Union, but National Union denied coverage on the basis that Manville's UM coverage did not exceed $50,000, the same coverage afforded by Peace's policy.

The issue of jurisdiction was not raised by National Union in the district court. But if the district court's judgment contravened constitutional limitations on its power, then National Union's objection was not waived by failing to object below. *See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). However, as discussed below, to the extent that the propriety of the issuance of a declaratory judgment was in the district court's discretion, the fact that National Union failed to raise the issue becomes relevant.

Federal standards guide the inquiry as to the propriety of declaratory relief in federal courts, even when the case is under the court's diversity jurisdiction. *See* J. Moore, J. Lucas & G. Grotheer, Jr., 6A *Moore's Federal Practice* § 57.02[5], at 57–14 to –15 (2d ed. 1989) (and cases cited therein); C. Wright, A. Miller & M. Kane, 10A *Federal Practice and Procedure* § 2756, at 576–78 (2d ed.1983) (and cases cited therein). The Declaratory Judgment Act provides that "[i]n a case of actual controversy ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

In essence, for a district court to have jurisdiction to issue a declaratory judgment, two conditions must be satisfied. First, the dispute must be a "case or controversy" within the confines of Article III of the United States Constitution—the "constitutional" inquiry. Second, the trial court, in its discretion, must be satisfied that declaratory relief is appropriate—the "prudential" inquiry.

The test for a "case or controversy," the constitutional inquiry, is whether the dispute "is definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). "It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* The question is "whether the facts alleged, under all the circumstances,

show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ National Union argues that no controversy can exist until White obtains a judgment against Peace, thereby obligating National Union to provide any UM coverage available to White. But in *Maryland Casualty Co.* the Supreme Court held that a controversy existed between an insurer and a person injured by the insured even though the injured person had not yet obtained a judgment against the insured. 312 U.S. at 274, 61 S.Ct. at 512. The fact that there was no formally adjudicated liability was not dispositive.

In *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330 (11th Cir.1989), the Eleventh Circuit was presented with the question that White's case presents. The insured, injured in an accident, sued the alleged tortfeasor in state court. The insured had underinsured motorist insurance with his insurer. *Id.* at 1332. The insurer sued in federal court for a declaratory judgment as to whether it would be liable. The district court dismissed the case because, in its view, the dispute did not present a sufficiently concrete controversy. *Id.* The principal reason for the district court's decision was that, under Georgia law, it was not proper to seek a declaratory judgment until the insured obtained a judgment against an underinsured tortfeasor. But the Eleventh Circuit reversed the district court, holding that under traditional constitutional principles, a "case or controversy" did exist. *Id.* at 1333. "The mere fact ... that the doors of Georgia's courts are closed to Cincinnati unless and until [the tortfeasor's liability] has been determined, does not mean that the doors of the federal courts are automatically closed ... where the requisites for diversity jurisdiction exist." *Id.*

We agree with the Eleventh Circuit's conclusion and hold that a "case or controversy" does exist in the present case. The fact that White has not obtained a judgment against Peace does not make the action any less definite and concrete, nor does it vitiate the adversity of the parties' interests.

Yet still, a district court may, in its discretion, refuse to issue a declaratory judgment. *See A.L. Mechling Barge Lines v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 342, 7 L.Ed.2d 317 (1961). Two questions should be asked when a court makes such a prudential decision: "(1) whether the judgment will 'serve a useful purpose in clarifying the legal relations in issue'; or (2) whether the judgment will 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *National R.R. Passenger Corp. v. Consolidated Rail Corp.*, 670 F.Supp. 424, 431 (D.D.C.1987) (citing *President v. Vance*, 627 F.2d 353, 364 n. 76 (D.C.Cir.1980), and E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)).

In the present case, the judgment of the district court will terminate the controversy surrounding the extent of Manville's UM coverage with National Union. Furthermore, it will serve a useful purpose by giving guidance to White as to the amount of insurance available to her if, as she expects, she obtains a judgment against Peace that will not be satisfied by Peace's insurance. In addition, it is important to note that the federal court proceeding is not duplicative; the state court is addressing only the tort issues and is not addressing insurance coverage issues. Thus, the concerns for judicial economy argue for, instead of against, issuance of a declaratory judgment. Finally, the fact that National Union did not object below to the propriety of the declaratory judgment is relevant in assessing whether the district court imprudently issued a declaratory judgment. In *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), the Supreme Court indicated that the fact that the propriety of a declaratory judgment was not raised in the district court but was raised for the first time on appeal should be considered in deciding whether issuing the de-

claratory judgment was the wiser course. *Id.* at 126, 88 S.Ct. at 746. In sum, we affirm the district court's exercise of jurisdiction as entirely proper.

### III.

As for the merits, National Union contends that the district court erred in holding that Manville had obtained $2,000,000 of UM coverage by failing to reject such default coverage as required by state law. National Union argues that principles of insurance law demand that a court conform an insurance policy to the intent of the parties. It claims that what the parties intended is the controlling question. It then demonstrates that, in all probability, the undisputed intent of Manville was to procure the minimum amount of UM coverage available under Virginia law.

Yet the intent of the parties as it affects the construction of the policy is largely irrelevant here. The case does not present us with the construction of a policy. It does not deal with how to interpret an ambiguous or missing term. Rather, we must decide if Manville complied with a state regulatory statute that mandates that an insured's UM coverage equal the policy's liability limits unless the insured rejects the default coverage and opts for a lesser minimum coverage. The only issue presented here is whether Manville properly rejected the default UM coverage.

National Union concedes that, because of a clerical omission, Manville did not complete the form sent to it concerning UM coverage in Virginia. But National Union claims that Manville communicated rejection by other means. First, National Union points to the fact that Manville did fill out the form that listed 39 other states, in which it rejected UM where possible and otherwise selected the minimum amount of coverage required. Those selections, National Union contends, were fully consistent with Manville's past practice of minimizing UM coverage. Thus, National Union claims that it was justified in relying on Manville's business practice in inferring a rejection of the default coverage.

■ Information that supports an inference by the insurer that the insured intends to reject a default level of coverage does not suffice, under Virginia law, as an actual "rejection" of that coverage. The statute's plain language explicitly required Manville to reject the default coverage by notifying National Union of that rejection. Furthermore, the law's explicit rejection requirement is consistent with its purpose of affording adequate protection to those injured by underinsured motorists. *See Grossman v. Glens Falls Ins. Co.*, 211 Va. 195, 176 S.E.2d 318 (1970).

■ National Union also argues that Manville did reject the default level of coverage when Hall, Manville's insurance broker, wrote National Union on August 31, 1984, informing it that Manville had rejected UM where possible and otherwise chose basic limits. But the letter was not delivered within the requisite twenty-day period required by the statute and therefore does not suffice as a rejection.[2]

■ Finally, National Union points out that because the Manville policy was a renewal policy, it did not even have to send Manville a UM coverage selection form. *See* Va.Code Ann. § 38.1–380.2(B) (1981) (recodified as amended at § 38.2–2202). National Union argues that it should not be penalized for Manville's clerical omission on a form that it was not required to provide. Accordingly, National Union claims that it should be entitled to rely on the information that Manville gave in 1983, when it did reject Virginia's default coverage.

But National Union did send the UM coverage selection forms, thereby precipitating Manville's communication to it of desired levels of UM coverage for the 1984 policy. Given that the 1984 selection form was sent, completed by the insured, returned, and, presumably, analyzed by the insurer, National Union cannot now avoid

---

2. We express no view on whether the letter would suffice had it been delivered within the twenty-day period.

the lack of a statutorily required rejection of default coverage by pointing to a prior one where a subsequent, albeit inadequate, rejection was furnished.

The district court's finding that Manville secured UM coverage equal to the amount of its liability coverage, $2,000,000, was not erroneous. Accordingly, the judgment of the district court is

AFFIRMED.