COMMERCIAL UNION INSURANCE
CO., Plaintiff,

v.

DETYENS SHIPYARD,
INC., Defendant.

CIV.A. No. 2:00–0389–18.

United States District Court,
D. South Carolina,
Charleston Division.

June 21, 2001.

Scott Bluestein, Charleston, SC, John Nicolletti, New York City, for plaintiff.

Lucas Padgett, Paul Tecklenburg, Rivers Jenkins, Charleston, SC, for defendant.

## ORDER

NORTON, District Judge.

This matter is before the court on defendant's Motion for Summary Judgment as to all causes of action for declaratory relief under the Protection & Indemnity Policy and for Partial Summary Judgment on plaintiff's First, Second, and Fourth causes of action; and for Partial Summary Judgment on Detyens' First, Second, and Third Causes of Action stated in its Counterclaim.

## I. FACTUAL BACKGROUND

This declaratory judgment action arises out of a claim for insurance coverage on a wooden drydock owned by Detyens Shipyard's Wando River facility ("Detyens") and insured by Commercial Union Insurance Company ("Commercial Union"). The subject drydock was constructed in approximately 1942, was permanently moored outside of any navigable channel, and had no propulsion or steering.[1]

---

1. Since the purchase of Drydock Number 1 in the mid–1970's, it has not been used as a means of transporting passengers and/or cargo. Furthermore, Drydock Number 1 was not intended to be used as a means of transporting passengers and/or cargo. It has not been transported in any fashion since the late 1970's, nor has it been used for navigation. *See* Affidavit of D. Loy Stewart.

International Marine Underwriters ("IMU") provided drydock, hull, and Protection and Indemnity ("P & I") coverage to Detyens from 1982 until 1991. In 1991, Commercial Union purchased IMU. In 1992, Commercial Union began writing hull, drydock, and P & I risks for Detyens.

In April 1999, Commercial Union issued four policies of insurance to Detyens and charged premiums totaling Two Hundred Seven Thousand Nine Hundred Thirty and No/100 Dollars ($207,930.00). The "hull" and "business interruption policy" includes "hull" insurance on two drydocks, six work barges, and a land-side crane. Specifically, Drydock Number 1, which is the subject of this litigation, was listed as Item 1 on Endorsement 5.[2] Item 2 was a second steel drydock also moored at Detyens' Wando facility.

The terms and conditions of Form Drydock 107, attached to the Dock Policy, govern the two drydocks. Form Drydock 107 provides that:

TOUCHING THE ADVENTURES AND PERILS which we, the said Assurers, are contented to bear and take upon us, they are of the Seas, Rivers, Lakes, Harbours, Men–of–War, Fire, Enemies, Pirates, . . . Arrests, . . . Explosions, Riots, and other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the Property hereby insured,

and of all other Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment, or Damage of the said Dock, & c., or any part thereof.

The P & I Policy issued by Commercial Union includes Endorsement 4, which lists vessels, drydocks, and work barges, including Drydock Number 1. The indemnity clause in the P & I policy provides in relevant part:

The underwriters agree to indemnify the Assured for any sums which the Assured, as owner of the Vessel, shall have become liable to pay, and shall have paid, in respect of any casualty or occurrence during the currency of the policy, but only in consequence of any matters set forth hereunder . . . (6) Costs or expense of, or incidental to, any attempted or actual removal or disposal of obstructions, wrecks or their cargoes under statutory power or otherwise pursuant to law, PROVIDED, however, that there shall be deducted from such claim for costs or expenses, the value of any salvage from the wreck inuring to the benefit of the Assured or any subrogee thereof.

Detyens claims that Hurricane Floyd destroyed Drydock Number 1 in 1999,[3] whereas Commercial Union claims that Drydock Number 1 sank due to its wasted condition.[4] Detyens claims that after Hur-

2. Commercial Union alleges that all relevant times, Drydock Number 1, was reported to be a five section floating drydock, Crandall Trussed sectional type, 413' in length, 112' in width and 48 feet in depth, located in or around the area of Wando, South Carolina.

3. Hurricane Floyd passed near the Charleston area on September 14–15, 1999, resulting in tropical storm winds in the Charleston area. As a result of power outages, Detyens alleges that one or more of the pumps on Drydock Number 1 failed to restart upon initiating generator power and resulted in the loss of the drydock. Commercial Union contests De-

tyens' allegations. Detyens claims that irrespective of the contested issues surrounding the loss, it is undisputed that Sections 1, 2 and 3 of the drydock sank to the bottom of the Wando River at its moored location outside of a navigable channel. It is also undisputed that no order has been received by Detyens from a government authority mandating removal of Drydock Number 1.

4. The crux of Plaintiff's arguments is that "unbeknownst to CU [Commercial Union] and prior to inception of the 1997 renewal policy, Detyens intentionally sank two (2) of

ricane Floyd, its marine surveyor, Martin, Ottaway, van Hemen & Dolan of Red Bank, New Jersey, determined that the drydock was a constructive total loss. Soon thereafter, Detyens made a claim under the Dock Policy of Nine Hundred Ninety Thousand and no/100 Dollars ($990,000.00) for the loss of Sections 1, 2, and 3 of Drydock Number 1. Commercial Union now seeks a declaration that there is no coverage for the damage or total loss claims because the subject policy was null and void *ab initio*. For the reasons articulated below, defendant's motion is granted in part and denied in part.

## II. SUMMARY JUDGMENT

Summary judgment shall be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial judge will grant summary judgment "if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Id.* The judge is not required to make findings of fact. *See id.* Rather, the threshold inquiry is whether "there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* When determining whether there is an issue for trial, the court must view the inferences to be drawn from the underlying facts in the light most favorable to the non-moving party. *See United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). In sum, summary judgment provides an avenue "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. LAW/ANALYSIS

### A. Admiralty Jurisdiction

■ At the outset, this court must address defendant's challenge to the court's earlier ruling that this case falls within the purview of admiralty jurisdiction granted to federal courts.[5] Article III, Section 2 of the United States Constitution provides that "the Judicial Power shall extend to all Cases of admiralty and maritime Jurisdiction." U.S. Const., Art. III, § 2. The statutory grant of admiralty jurisdiction is codified at 28 U.S.C. § 1333. Section 1333 provides that: "The district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases of other remedies to which they are otherwise entitled." For the reasons that follow, admiralty jurisdiction is appropriate in this case.[6]

---

the five (5) sections of the Drydock." (Complaint at ¶ 29)

5. This court carefully considered and ruled upon Detyens' arguments regarding subject matter jurisdiction at a hearing in May of 2000.

6. There is no dispute that this court has jurisdiction over this case. The dispute arises in

the mode of trial. The parties are at odds over who the ultimate fact-finder will be. There is complete diversity in this case, thus this court may invoke jurisdiction via 28 U.S.C. § 1331. Plaintiff has invoked the admiralty jurisdiction of this court, while defendant contends that only diversity jurisdiction is applicable.

Detyens previously argued that admiralty jurisdiction is not present in this case because Drydock Number 1 is not a vessel. In response, Commercial Union argued that this case involves a maritime contract, thus clearly invoking the admiralty and maritime jurisdiction of this court. Detyens has readdressed these earlier arguments. As discussed below, Drydock Number 1 is not a vessel. However, admiralty jurisdiction pursuant to 28 U.S.C. § 1333 is proper in the case *sub judice* based upon the fact that the subject matter of the contract is maritime in nature.

**(1) Drydock Number 1 Is Not A "Vessel"**

▓ "When a floating drydock is moored and in use as a drydock, courts have consistently found that the drydock is not a 'vessel.'" *In Re McAllister Towing of Virginia, Inc.*, NO. 2:00–CV–36, 2000 A.M.C. 2164, 2000 WL 1881197, *3 (E.D.Va. July 11, 2000); *Bender Shipbuilding & Repair Co. v. Brasileiro*, 874 F.2d 1551, 1554 (11th Cir.1989) ("Courts have consistently found that a floating dry dock is not a 'vessel' within the meaning of admiralty jurisdiction when a drydock is moored and in use as a drydock."); *see also Cope v. Vallette Dry-Dock Co.*, 119 U.S. 625, 627, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (finding that a moored dry dock was not a vessel for purposes of a salvage claim in admiralty); *United States v. Moran Towing & Transp. Co.*, 374 F.2d 656, 662–63 (4th Cir.1967), *reversed on other grounds*, 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968) (holding that a dry dock constituted a vessel when its attachments to the land had been severed and it was moving over navigable waters under tow and equipped with navigation lights, but noting that a dry dock in service, permanently moored to the land, "has most of the attributes of such an extension of the land as a wharf or a dock" and has

been held not to be a vessel); *Keller v. Dravo Corp.*, 441 F.2d 1239, 1244 (5th Cir.1971) ("While we are unwilling to promulgate an absolute rule of law that a floating dry dock can never be a vessel, we [find] . . . as a matter of law, [that] a floating dry dock is not a vessel when it is moored and in use as a dry dock."); *Royal Ins. Co. v. Pier 39 Ltd. Partnership*, 738 F.2d 1035, 1037 (9th Cir.1984) ("The general rule is that stationary floating dry docks are not vessels."); *J.M.L. Trading Corp. v. Marine Salvage Corp.*, 501 F.Supp. 323, 324 (E.D.N.Y.1980) ("The great majority of decisions concerning the 'reach' of admiralty jurisdiction over drydocks have held that drydocks when in use as drydocks are not ships or vessels subject to such jurisdiction."). However, when the dry dock is being transported from one location to another, the drydock may then be deemed a vessel. *See e.g., In Re McAllister*, 2000 WL 1881197, *3 (citing *United States v. Moran Towing & Transp. Co.*, 374 F.2d 656, 663 (4th Cir. 1967), *reversed on other grounds*, 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968)). As evidenced from the cases cited above, a majority of courts follow the rule that when a drydock is moored to the shore and in use as a drydock, it is not a vessel. There is no question in this case that Drydock Number 1 was moored and in use as a drydock at the time it was allegedly damaged. Thus, the insured drydock was clearly not a vessel as that term is defined for jurisdictional purposes.

**(2) Marine Insurance Policy**

▓ Commercial Union argues that even if the drydock was not a vessel, the admiralty jurisdiction of this court still extends over the insurance contract because it is a maritime contract within the admiralty and maritime jurisdiction of the federal courts. "It is well-settled that fed-

eral admiralty jurisdiction over maritime contracts extends to suits involving marine insurance policies." *Atlantic Mut. Inc. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196 (2d Cir.1992). Consequently, the issue is whether an insurance policy covering a moored drydock which operates to repair ships and barges is a policy of marine insurance.

### (a) Interest Insured is a Marine Interest

 A maritime contract "is one that ... relates to a ship and its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment." 1 *Benedict on Admiralty* § 182, at 12–4 (8th ed.1996); *see also J.A.R., Inc. v. M/V Lady Lucille,* 963 F.2d 96, 98 (5th Cir.1992). "The only general rule is that to be a maritime contract, the subject matter [i.e. the insurable interest] of the contract must be directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract related in some preliminary (shoreside) manner to maritime affairs." 1 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 3–10, at 111 (2d ed.1994). In other words, the contract must be wholly maritime in nature to be cognizable in admiralty. *See Simon v. Intercontinental Transport B.V.,* 882 F.2d 1435, 1442 (9th Cir.1989) (citing *Home Ins. Co. v. Merchant's Transp. Co.,* 16 F.2d 372, 374 (9th Cir.1926); *E.S. Binnings, Inc. v. M.V Saudi Riyadh,* 815 F.2d 660, 665 (11th Cir.1987); 1 *Benedict on Admiralty* § 183 (7th ed.1988)).

 The interest insured in this case is Drydock Number 1, a drydock that was used in maritime business or commerce to repair ships and barges. "It is axiomatic that the routine repair of vessels is a crucial maritime activity." *Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, 351 (11th Cir.1994).

Moreover, contracts to repair or perform extensive reconstruction of a ship are within the admiralty jurisdiction of federal courts. *See New Bedford Dry Dock Co. v. Purdy (The Jack–O–Lantern),* 258 U.S. 96, 99–100, 42 S.Ct. 243, 66 L.Ed. 482 (1922); *see also Sea Vessel, Inc.,* 23 F.3d at 351 ("[T]he routine repair of a vessel in a drydock on navigable waters bears a significant relationship to a traditional maritime activity such that admiralty jurisdiction attaches.") As such, drydocks play an integral role in the operation and maintenance of ships and other vessels—a crucial maritime activity. Thus, it would be anomalous to find that the interest insured, i.e., Drydock Number 1 was anything other than a marine interest.

### (b) Risks Insured Against Are Marine Interests

██ The insurance policy at issue insures Drydock Number 1 and numerous equipment barges, including deck and tank barges. The crux of Detyens' argument is that the drydock endorsement in the policy provides "all risk" coverage, so that it includes non-marine risks, whereas the remainder of the insurance policy covering the barges addresses only traditional marine risks.

██ For admiralty jurisdiction to exist, "the subject contract must be wholly maritime in nature, or any nonmaritime elements must be either insignificant or severable." *Wilkins v. Commercial Inv. Trust Corp.,* 153 F.3d 1273, 1276 (11th Cir.1998); *see also Transatlantic Marine Claims Agency v. Ace Shipping Corp.,* 109 F.3d 105, 109 (2d Cir.1997); *Berkshire Fashions, Inc. v. M/V Hakusan II,* 954 F.2d 874, 880 (3d Cir.1992) (stating the general rule and its two exceptions); *Aqua–Marine Constructors, Inc. v. Banks,* 110 F.3d 663, 673 n. 6 (9th Cir.1997) (recognizing the two exceptions to the gen-

eral rule that contracts must be wholly maritime in nature to invoke admiralty jurisdiction); *Stickelber v. Fisher,* 11 F.Supp.2d 1374, 1375 (S.D.Fla.1998) (stating the general rule and its two exceptions); *New York Marine & Gen. Ins. Co. v. S/S Ming Prosperity,* 920 F.Supp. 416, 419 (S.D.N.Y.1996) (stating same); *Puerto Rico Maritime Shipping Auth. v. Luallipam,* 631 F.Supp. 1472, 1474 (D.Puerto Rico 1986) (stating same); *Outbound Maritime Corp. v. P.T. Indonesian Consortium of Constr. Indus.,* 582 F.Supp. 1136, 1142 (D.Md.1984) ("To serve as the basis of maritime jurisdiction[,] a contract must be 'purely' maritime. In mixed contracts, maritime jurisdiction may nonetheless attach if the non-maritime elements of the contract are not substantial or if they are separable from the maritime elements.").

For purposes of "hull coverage" Drydock Number 1 was insured against losses arising from

the Seas, Rivers, Lakes, Harbours, Men–of–War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart or Counter Mart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Barratry of the Master and Mariners, Explosions, Riots, and other causes of whatsoever nature arising on shore or otherwise, causing Loss of or injury to the Property hereby insured, and of all other Perils, Losses, and Misfortunes that have or shall come to the Hurt, Detriment, or Damage of the said Dock, & c., or any part thereof.

Form 107. Thus, as the archaic and colorful language of the policy so well reveals, the non-maritime nature of the risks insured in this case were not substantial and only incidental to the marine risks insured. The insurance policy covered marine risks for the numerous barges and Drydock Number 1; the policy also appears to have covered, in a catch-all clause in the drydock endorsement, non-specific non-marine risks associated with the drydock. Such non-marine coverage was only a small part of the coverage provided by the insurer, when taken in context of the coverage afforded to all the insured interests or when taken in the context of the enumerated marine risks Commercial Union agreed to insure against for the drydock.[7] Thus, admiralty jurisdiction attaches to this case. "With admiralty jurisdiction comes the application of substantive admiralty law." *East River S.S. Co. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Thus, since this court finds that the subject time hull insurance policy is a maritime contract, federal maritime law will govern the construction and interpretation of the policy on those issues where a judicially established federal maritime rule exists. *See generally, Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

### B. This Court Lacks Subject Matter Jurisdiction Over Any Declarations of Rights Under the P & I Policy

 Plaintiff is seeking declaratory relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. The existence of a true case or controversy is required before a court's subject matter jurisdiction may be invoked. *See Evers v. Dwyer,* 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958). "The test for a 'case or controversy,' ... is whether the dispute

---

7. Detyens contends that "the fact that an object is used as a tool in the repair of the vessel does not make insurance on the tool 'marine' insurance." (Motion for Partial Summary Judgment at 24)

'is definite and concrete, touching the legal relations of parties having adverse legal interests.'" *White v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 167–68 (4th Cir.1990) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). In deciding whether a justiciable controversy exists, a district court looks to "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *White v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 913 F.2d 165, 167–68 (4th Cir. 1990) (quoting *Maryland Cas. Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). The P & I policy presented to this court for adjudication requires wreck removal "under statutory authority" or other manner prescribed by law prior to filing a claim. This contingency has not occurred as there is no order of a government authority mandating removal of Drydock 1. Thus, Commercial Union seeks an advisory opinion that any potential, but unasserted claim for wreck removal is not covered under the P & I policy. Since this claim is not ripe for adjudication, this court dismisses without prejudice all claims asserted by Commercial Union regarding wreck removal under the P & I policy.[8]

## C. Seaworthiness Has No Application Where The Insured Maritime Interest is Not A Vessel

Commercial Union's First and Second causes of action arise out of allegations that Detyens intentionally sank two of the five sections of the dry dock, rendering the drydock unseaworthy. Commercial Union seeks to void the P & I and Hull policies *ab initio* on the basis that Drydock Number 1 was unseaworthy at the inception of the 1997 policy. (Amended Complaint at ¶ 36).[9]

### Warranty of Seaworthiness Applies Only to Vessels

Generally, the implied warranties of seaworthiness are "premised on the notion that, because the insured is best able to foresee the nature, extent, and necessities of the specific voyage, the insured is also best able to have the vessel adequately prepared for the voyage." *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1433 (5th Cir.1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (1993)[10] In the legion case of

---

**8.** Commercial Union has conceded that there is no warranty of seaworthiness in a Protection and Indemnity policy.

**9.** Commercial Union claims that "Detyens warranted that the Drydock was seaworthy ... Under the circumstances, Detyens failed to exercise due diligence to maintain the Drydock in a seaworthy condition at time of policy inception in 1997 and thereafter." (Complaint at ¶ 35) "By virtue of the foregoing premises, including but not limited to Detyens' breach of the absolute implied warranty of seaworthiness, the Drydock insurance policy issued to Detyens for the subject Drydock was and is void *ab initio* since 1997 and any claim for damage to, and/or total loss of, the Drydock is not recoverable from CU."

In its second cause of action, Commercial Union claims that "[a]t all times relevant, the subject Drydock was not seaworthy during the 1999 renewal policy period from April 29, 1999 to April 29, 2000." (Complaint at ¶ 39) As such, Commercial claims that "Deytens' failure to properly maintain the physical condition of the Drydock throughout the policy period resulted in a breach of Detyens' implied warranty of seaworthiness of the Drydock." (Complaint at ¶ 41)

**10.** The implied warranty of seaworthiness is, in fact, two (2) separate warranties. *See Continental Ins. Co. v. Lone Eagle Shipping, Ltd.*, 952 F.Supp. 1046, 1067 (S.D.N.Y.1997), *aff'd*, 134 F.3d 103 (2d Cir.1998); *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d

*The Caledonia*, the Supreme Court explained that "every person who proposes to any insurers to insure his ship against sea perils, during a certain voyage, impliedly warrants that his ship is, in every respect, in a suitable condition to proceed and continue on that voyage and to encounter all common perils and damages with safety." 157 U.S. 124, 131, 15 S.Ct. 537, 39 L.Ed. 644 (1895).

 Seaworthiness, as discussed above, applies only to vessels. *See In Re McAllister Towing of Virginia, Inc.,* 2000 A.M.C. 2164, 2168 (E.D.Va.2000).[11] In the context of the warranty of seaworthiness on a drydock, a district court noted that:

> When a floating drydock is moored and within the control of its owner, a worker may not rely upon any assumptions of seaworthiness which would normally arise in connection with a vessel. When the owner presents the drydock for towing, without the aid of any other type of traditional vessel, and entrusts its care to a towing company who may be held liable for damages to the drydock, however, the owner impliedly warrants a minimal degree of seaworthiness at least to the towing company. In such situations, the owner has put the drydock

into navigation and treated the drydock as a vessel sufficiently seaworthy to be towed some distance. Therefore, within the limited relationship between the tug and the tow, and given the reasonable assumptions which arise in the context of a towing contract, the drydock necessarily must be considered a "vessel."

As discussed above, the subject drydock is not a vessel.[12] Since, there are no warranties of seaworthiness on a non-vessel,[13] this court grants defendant's motion for summary judgment on plaintiff's First and Second Causes of Action. *See id.*

### D. *Uberrimae Fidei* /Utmost Good Faith

 Commercial Union seeks a declaration that the insurance policies on Drydock Number 1 are void *ab initio* based on allegations that Detyens made material misrepresentations and/or nondisclosures when it attained coverage on Drydock Number 1 and thereafter. Thus, Commercial Union is claiming that Detyens did not act with the utmost good faith, thus, implicating the doctrine of *"uberrimae fidei."* Detyens moves for partial summary judgment on this claim, arguing that the doctrine of *uberrimae fidei* applies only to

385, 388 (5th Cir.1957). In a letter dated March 22, 2001, Commercial Union attempts to distinguish *McAllister* based on the fact that there different types of seaworthiness. *McAllister* involved a seaworthiness warranty owed by an owner of a barge or other towed vessel to the tower/tug operation. This court finds that while different warranties of seaworthiness do exist, each type of warranty has the common characteristic of applying only to vessels. Drydock Number 1 is not a vessel. Thus, no warranty of seaworthiness attaches to it.

11. The warranty of seaworthiness also does not apply to those vessels that are no longer in navigation ("dead ships"). *See generally, Keller v. Dravo Corp.,* 441 F.2d 1239, 1245 (5th Cir.1971) (finding that there can be no

warranty of seaworthiness on a vessel taken out of navigation).

12. The drydock can be converted into a vessel if it is under tow and/or moving over navigable waters on a regular basis. *See generally, U.S. v. Moran Towing & Transp. Co.,* 374 F.2d 656 (4th Cir.1967), *reversed on other grounds,* 389 U.S. 575, 88 S.Ct. 689, 19 L.Ed.2d 775 (1968). Thus, if Drydock Number 1 had become a vessel, the warranties of seaworthiness would have applied to the subject insurance policies.

13. This court's decision to grant summary judgment on plaintiff's First and Second Causes of Action in its Counterclaim renders defendant's First, Second, and Third Causes of Action moot.

vessels, thus making it inapplicable to this case. This court denies Detyens' motion on grounds that the doctrine of *uberrimae fidei* is a firmly entrenched federal doctrine mandating is application to the case *sub judice.*[14]

 "Insurance policies are traditionally contracts *uberrimae fidei* and a ·failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Stipcich v. Metropolitan Life Ins. Co.,* 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 citing *Carter v. Boehm,* 3 Burrows, 1905; *Livingston v. Maryland Insurance Co.,* 6 Cranch, 274, 3 L.Ed. 222; *McLanahan v. Universal Insurance Co.,* 1 Pet. 170, 7 L.Ed. 98; *Phoenix Life Ins. Co. v. Raddin,* 120 U.S. 183, 189, 7 S.Ct. 500, 30 L.Ed. 644 (1887); *Hardman v. Firemen's Insurance Co.,* 20 F. 594 (C.C.). "Literally translated the phrase 'uberrimae fidei' means of the utmost good faith." *North American Specialty Insurance Co. v. Savage,* 977 F.Supp. 725, 732 (D.Md.1997) (internal citations omitted). "Marine insurance had long been recognized as a contract of *uberrimae fidei,* requiring the utmost good faith and full disclosure by the insured, or the policy may be void *ab initio.*" David D. Hallock, Jr., *Recent Developments in Marine Hull Insurance: Chartering A Course Through The Coastal States of the Fourth, Fifth, Ninth, and Eleventh Circuits,* 10 U.S.F. Mar. L.J. 277, 309 (1998). If such a disclosure is not made by the insured, the insurance contract will be deemed void. *See International Ship Repair & Marine Servs., Inc. v. St. Paul Fire & Marine Ins. Co.,* 922 F.Supp. 577, 580 (M.D.Fla.1996). In making this determination, "it does not matter whether the insured's failure to disclose was due to negligence, mistake, accident, or voluntary ignorance." *See id.* citing *Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689 (11th Cir.1984). The majority of courts faced with the application of *uberrimae fidei* to a marine insurance policy, have found that utmost good faith applies. *See e.g., Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir.1984); *Knight v. United States Fire Insurance,* 804 F.2d 9, 13 (2d Cir.1986) ("It is well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith.")

The Fifth Circuit has held that the doctrine of *uberrimae fidei* does not apply to a marine insurance contract, but rather Texas insurance law applies. *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 886 (5th Cir.1991). In reaching this conclusion, the Fifth Circuit reasoned that the doctrine of *uberrimae fidei* did not constitute entrenched federal precedent. *See id.* at 886–89 ("We therefore conclude, albeit with some hesitation, that the *uberrimae fidei* doctrine is not 'entrenched federal precedent.'") Furthermore, the court found that the state interest (Texas) in the

14. Whether or not the ancient doctrine of *uberrimae fidei* still applies to admiralty cases being adjudicated in federal courts has created an academic debate between federal courts and scholars alike. *See, e.g.,* Thomas J. Schoenbaum, *The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law,* 29 J. Mar. L. and Com. 1 (1998). ("Both in the United States and elsewhere the doctrine of utmost good faith is increasingly being questioned or repudiated.") Plaintiff and Defendant argued their respective positions on this issue without notifying the court of this debate, thus, sending the court on a wild goose chase meandering through a grueling, and relatively uninteresting labyrinth of admiralty treaties, law review articles, and case law. Thus, the conclusion that the doctrine of *uberrimae fidei* applies to this case was reached on grounds the parties failed to present to this court.

dispute exceeded federal maritime interests in the insurance dispute.[15] Even if this court were to adopt the analysis discussed in *Anh Thi Kieu,* the doctrine of *uberrimae fidei* would still govern the insurance policies issued on Drydock Number 1. There is no South Carolina state law mandating a contrary conclusion and no Fourth Circuit case law mandating that district courts abandon the doctrine. Thus, this court finds that at all times Commercial Union and Detyens were bound by the duty of utmost good faith. Whether Detyens concealed facts material to the risk is a factual issue to be determined by this court at a later date.

 Based on the foregoing, this court finds that the doctrine of utmost good faith is a firmly entrenched federal maritime doctrine, applicable to the marine insurance policy in this case. The facts as presented are in dispute as to whether or not Detyens complied with the doctrine's disclosure requirements. Thus, Detyens' motion for summary judgment on plaintiff's fourth cause of action is denied.

## IV. CONCLUSIONS

### A. This court has admiralty jurisdiction over this case

Even though Drydock Number 1 is not a vessel, it is still a marine interest. The drydock is an integral part of maritime commerce because its sole purpose is the repair of vessels. Accordingly, any litigation arising out of the insurance policies on Drydock Number 1 falls clearly within this court's admiralty jurisdiction.

### B. The wreck removal claim arising under the P & I Policy is dismissed without prejudice

The government has not mandated wreck removal of the subject drydock. Thus, the necessary prerequisite for a justiciable controversy for the P & I Policy has not been satisfied.

### C. Seaworthiness Applies Only To Vessels

There are no warranties of seaworthiness on a non-vessel. Drydock Number 1 is not a vessel. Accordingly, summary judgment is granted on plaintiff's First and Second causes of action.

### D. The Doctrine Of *Uberrimae Fidei* Is Applicable

This court has found that jurisdiction is vested in admiralty law. As such, substantive admiralty law will be applied to this case. The doctrine of *uberrimae fidei* is a firmly entrenched maritime doctrine. Thus, defendant's motion for partial summary judgment on plaintiff's Fourth Cause of Action is denied.

It is therefore,

**ORDERED,** for the foregoing reasons that any claim for wreck removal arising under the P & I policy is dismissed without prejudice.

**IT IS FURTHER ORDERED** that defendant's Motion for Partial Summary Judgment on plaintiff's First and Second Causes of Action is **GRANTED.**

---

**15.** The Fifth Circuit reasoned that "[f]rom their experience, states are far better equipped to balance the risks that each party to an insurance contract endures. The State of Texas has concluded that the burden of unintentional misrepresentations should fall on the insurance underwriter. Texas has a material interest in ensuring that marine insurance underwriters do not invalidate he insurance protection of Texas citizens on the basis of misrepresentations that were neither willfully or intentionally asserted." *Id.* at 887.

IT IS ORDERED that defendant's Motion for Summary Judgment on plaintiff's Fourth Cause of Action is **DENIED.**

IT IS FURTHER ORDERED THAT defendant's Counterclaims One, Two, and Three are **MOOT.**[16]

**AND IT IS SO ORDERED.**

16. **First Counterclaim (Inchmaree Clause Ineffective)**

Defendant's First Counterclaim seeks a declaration that "the Inchmaree clause in the Dock Policy cannot restrict 'all risk' coverage extended in Drydock Form 107, and therefore, no duty of due diligence exists." (Amended Answer and Counterclaim at 24) Plaintiff relies upon allegations that defendant failed to exercise due diligence in its First Cause of Action for breach of the warranty of seaworthiness. As such, defendant's First Counterclaim is now rendered moot.

**Second Counterclaim (No Warranty of Seaworthiness in Dock Policy & P & I Policy)**

This claim is rendered moot by the court's ruling that there are no warranties of seaworthiness on a non-vessel.

**Third Counterclaim (Breach of Warranties Waived in Dock Policy)**

Detyens argues that it "is entitled to a declaration that the drydock is covered under the Dock Policy in case of any breach of warranty, and CU has the obligation in such event to agree to any additional premium required after the receipt of notice of an alleged breach of warranty." This claim is rendered moot by the court's seaworthiness ruling.